**Wanda Sue CLARK,**
**Respondent-Appellant,**

v.

**Gary Manson CLARK,**
**Petitioner-Appellee.**

No. 1–679A159.

Court of Appeals of Indiana,
First District.

May 13, 1980.

Paul J. Watts and C. Laurence Yinger, Spencer, for respondent-appellant.

George B. Mathes, Spencer, for petitioner-appellee.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Wanda Sue Clark (Wanda) appeals the order of the Owen Circuit Court transferring custody of her daughter, Kimberly Michelle Clark (Kim), to the girl's father, Gary Manson Clark (Gary).

## FACTS

This action arose upon Gary's filing a Petition for Order of Custody and Wanda's filing a Motion for Rule to Show Cause.

Wanda and Gary were married on June 8, 1968; Kim was born July 27, 1971. Wanda petitioned for dissolution of the marriage on April 2, 1976. On June 18, 1976, the Owen Circuit Court entered its Dissolution of Marriage Decree which included a flexible agreement between the parties that while custody of Kim was to be with Wanda, visitation rights were to be worked out at the convenience of the parties. From the time of the divorce in June 1976 until July 1978 Wanda lived in Vincennes, Indiana, moving about within the Vincennes area five (5) times. There was testimony that Wanda had held at least seven (7) jobs from the time of the divorce until January 15, 1979. Wanda obtained an abortion at some point shortly after the divorce and spent the weekend prior to the emergency custody hearing of December 11, 1978, in the intensive care unit of Good Samaritan Hospital in Vincennes, Indiana, as a result of taking too many aspirins. This was the emergency which precipitated Gary's filing his Petition for Order of Custody.

After the divorce Gary continued to live in Spencer, Indiana, moving three (3) times within Spencer until he settled in his current home in 1977. Gary maintained his employment at the Owen County Farm Bureau Co-Operative throughout the time under discussion. Gary and Linda Clark were married on September 3, 1978, after having lived together for over a year with her two (2) children from two (2) previous marriages. Kim lived with Gary and Linda in June and July of 1978 at Wanda's request while Wanda attended a course in restaurant management at Macomb, Illinois, and while she began training for an assistant manager's position in a Sirloin Stockade restaurant in Terre Haute, Indiana. At an undetermined point toward the middle or end of July 1978 Wanda went to Bowling Green, Kentucky, to take care of her mother, living with her mother and twin sisters in her mother's three bedroom trailer.

Wanda took Kim to live with her in Kentucky on July 24, 1978, but because of the crowded living conditions in her mother's trailer asked Gary to pick up Kim and put her in school in Spencer. Gary did so. However, on October 19, 1978, Wanda arrived at Gary's house purportedly to take Kim to Michigan to celebrate Wanda's brother's graduation from the navy, but instead took Kim back to Kentucky to live. Kim spent the Thanksgiving holiday in 1978 with Gary and Linda, but Gary did not see Kim again until he picked her up at Wanda's step-mother's home in Vincennes on December 6, 1978. According to their agreement, Wanda was to call Gary on Saturday, December 9, regarding the time he should return Kim to her; however, Wanda called Friday asking that Gary return Kim to Vincennes at noon Saturday. Because Gary had to work until noon on Saturday, they agreed that Gary could bring her at 2:00 p. m. instead. When he learned on Saturday morning that Wanda had been hospitalized after having taken an excessive number of aspirins on Friday night, Gary refused to take Kim to Vincennes. On Monday, December 11, 1978, Gary filed his Petition for Order of Custody and enrolled Kim in the Spencer Elementary School System. Alleging that an emergency existed, Gary requested that the court assume jurisdiction over Kim, issue a Temporary Restraining Order placing temporary custody of the child with him, and modify the custody decree in his favor. Meanwhile, Wanda filed a Motion for Rule to Show Cause seeking to have Gary punished for contempt of the divorce decree awarding her custody of Kim. An emergency hearing was held beginning at 4:45 p. m. December 11, 1978. The court found that no emergency existed which would justify a temporary change in custody and ordered Gary to return Kim to the custody of her mother. Gary did so and, pursuant to the court's admonition, requested that a hearing be set for a permanent, as opposed to emergency, modification of custody. Said hearing commenced Friday, January 12, 1979, and concluded Monday, January 15, 1979. At the conclusion of the Friday hearing the court ordered

Wanda to bring Kim to Indiana for a visit with Gary on the weekend, but Wanda failed both to bring Kim to Indiana on the weekend and to appear for the conclusion of the custody hearing on Monday. Having heard further evidence, the court transferred custody of Kim to Gary and issued a body attachment for Wanda's arrest, but advised Wanda's attorney that he would set aside the order and reopen the hearing if Wanda could show cause for her non-appearance and failure to comply with the court's order. On March 16, 1979, Wanda through her attorney filed her Motion to Correct Errors requesting either that custody of Kim be returned to her or, in the alternative, that a new hearing be granted. The court scheduled the matter for *further* hearing on April 9, 1979, and denied Wanda's Trial Rule 76(5) Motion for Change of Venue filed on March 26, 1979. Wanda filed her second Motion to Correct Errors on June 4, 1979, from which she has perfected this appeal.

## ISSUES

The issues presented for review by appellant which we have rearranged and consolidated in the aid of discussion are as follows:

1. Whether the trial court made a proper finding of jurisdiction to hear this cause under the Uniform Child Custody Jurisdiction Law;

2. Whether the court erred in denying appellant's Motion for Change of Venue;

3. Whether the court erred in modifying the original award of custody in the absence of a specific finding of a continuing and substantial change in circumstances; in addition, whether the court erred in improperly basing its modification on punitive motives;

4. Whether the court erred in denying appellant's Motion for an Immediate Finding [Motion for Involuntary Dismissal] at the close of plaintiff-appellee's case in chief;

5. Whether the court's denial of appellant's request for a continuance infringed upon her due process rights to a full and fair hearing;

6. Whether the court denied appellant's constitutional rights to due process of law by basing its decision on improperly admitted hearsay evidence;

7. Whether the court erred in denying appellant's Motion for Rule to Show Cause;

8. Whether the court erred by issuing a Body Attachment for appellant.

## DECISION

For the reasons set forth in the discussion below, we affirm.

*Issue One*

We agree with appellant that the court below did not make a proper finding of subject matter jurisdiction pursuant to Indiana's Uniform Child Custody Jurisdiction Law (the Uniform Act), IC 31–1–11.6–1—31–1–11.6–24, as interpreted by this court in *Campbell v. Campbell*, (1979) Ind.App., 388 N.E.2d 607. In *Campbell* at 608, Judge Robertson wrote:

"We believe that failure to even consider, let alone comply with the Act goes to the very essence of the trial court's power to adjudicate a child custody dispute; that is, the threshold requirements of the Act are directed to the subject matter jurisdiction of the court. At such, the lack of such jurisdiction may be raised at any time by the parties, or *sua sponte* by a court of review. *Decatur County Rural Electric Membership Corporation v. Public Service Company*, (1971) 150 Ind.App. 193, 275 N.E.2d 857. Subject matter jurisdiction cannot be imposed by the consent of the parties (*Decatur County, supra*), and must be derived from statute or the Constitution. *Farley v. Farley*, (1973) 157 Ind.App. 385, 300 N.E.2d 375. It differs from jurisdiction over the particular case which may be waived. *See Board of Trustees of Town of New Haven v. City of Fort Wayne*, (1978) Ind., 375 N.E.2d 1112; *Public Service Company of Indiana, Inc. v. Decatur County Rural Electric Membership Corporation*, (1977) Ind.App., 363 N.E.2d 995.

"In this case we believe the Act is intended to be the exclusive source of authority to adjudicate a custody dispute."

■■■ In the instant case both parties initially acknowledged the subject matter jurisdiction of the Owen County Circuit Court under the doctrine of continuing jurisdiction. This theory was spelled out by our Supreme Court in *Stone v. Stone*, (1902) 158 Ind. 628, 632, 64 N.E. 86, 87:

"Since the organization of our state government it has been the established policy of the law to regard the minor children of divorced parents as wards of the court in the same general way that minor children of deceased parents are regarded. The nurture and proper training of such children are subjects of vital interest to the State, as well as to the children themselves, and when the family has thus been broken up, and the children taken to other homes and exposed to the mutual animosities and jealousies of their parents, and their happiness and usefulness as citizens endangered, the court granting the divorce must be deemed to have full and continuing jurisdiction, during the minority of such children, to make from time to time such orders and modifications thereof, with respect to their care, custody, and control, as are deemed expedient; the interests of society and welfare of the children, in all such inquiries,

being the paramount and controlling consideration."

Under this universally recognized theory of jurisdiction the Owen Circuit Court would continue to retain jurisdiction over custody matters arising from the divorce decree it entered in 1976 throughout the minority of Kim Clark. Therefore, in 1978 when Gary came before the court seeking an emergency modification of the original custody agreement and when Wanda sought to have Gary found in contempt for refusing to return Kim to her (Wanda's) step-mother upon termination of visitation, neither the parties nor the court questioned the court's jurisdiction over the subject matter at issue. Since the adoption in Indiana of the Uniform Act in 1977 and the *Campbell* case decided April 26, 1979, however, the doctrine of continuing jurisdiction has been given a new twist.[1] While it is clear that the Uniform Act applies only to interstate, not intrastate, custody disputes (*Adams v. Adams*, (1979) Fla.App., 374 So.2d 29), the court now has an affirmative duty to determine the question of its subject matter jurisdiction. *Campbell v. Campbell, supra; Vanneck v. Vanneck*, (1979) 68 A.D.2d 591, 417 N.Y.S.2d 258; *In re Marriage of Settle*, (1976) 25 Or.App. 579, 550 P.2d 445, *rev'd. on grounds*, 276 Or. 759, 556 P.2d 962; *Clark v. Superior Court*, (1977) 73 Cal. App.3d 298, 140 Cal.Rptr. 709; *Bosse v.*

1. It was clearly not among the purposes of the Uniform Act to abrogate the continuing jurisdiction of the court which had made the original custody award. The Commissioners have stated that

"[c]ourts which render a custody decree normally retain continuing jurisdiction to modify the decree under local law. Courts in other states have in the past often assumed jurisdiction to modify the out-of-state decree themselves without regard to the preexisting jurisdiction of the other state. *See People ex rel. Halvey v. Halvey*, 330 U.S. 610, 67 S.Ct. 903, 91 L.Ed. 1133 (1947). In order to achieve greater stability of custody arrangements and avoid forum shopping, subsection (a) declares that other states will defer to the continuing jurisdiction of the court of another state as long as that state has jurisdiction under the standards of this Act. In other words, all petitions for modification are to be addressed to the prior state if that state has

sufficient contact with the case to satisfy section 3. The fact that the court had previously considered the case may be one factor favoring its continued jurisdiction. If, however, all the persons involved have moved away or the contact with the state has otherwise become slight, modification jurisdiction would shift elsewhere."

9 U.L.A. *Uniform Child Custody Jurisdiction Act* § 14 (Master Edition 1979) at 154. Courts in interpreting the Uniform Act have exercised a preference in favor of continuing jurisdiction where there is a significant connection remaining with the home state at the time a modification is sought. *See Ehr v. Ehr*, (1979) 77 Ill. App.3d 540, 33 Ill.Dec. 11, 396 N.E.2d 87; *Carson v. Carson*, (1977) 29 Or.App. 861, 565 P.2d 763; *Fry v. Ball*, (1975) 190 Colo. 128, 544 P.2d 402; *Brown v. District Court In and For Denver*, (1976) Colo., 557 P.2d 384; *Moran v. Moran*, (1972) N.Dak., 200 N.W.2d 263.

*Superior Court*, (1979) 89 Cal.App.3d 440, 152 Cal.Rptr. 665; *Ehr v. Ehr*, (1979) 77 Ill.App.3d 540, 33 Ill.Dec. 11, 396 N.E.2d 87. The legislature contemplated that courts should become cognizant of the applicability of the Uniform Act to a custody matter at the outset of the action in at least two ways. First, IC 31–1–11.6–9 provides:

"(a) Every party in a custody proceeding in his first pleading or in an affidavit attached to that pleading shall give information under oath as to the child's present address, the places where the child has lived within the last five [5] years, and the names and present addresses of the persons with whom the child has lived during that period. In this pleading or affidavit every party shall further declare under oath whether:

(1) He has participated (as a party, witness, or in any other capacity) in any other litigation concerning the custody of the same child in this or any other state;

(2) He has information of any custody proceeding concerning the child pending in a court of this or any other state; and

(3) He knows of any person not a party to the proceedings who has physical custody of the child or claims to have custody or visitation rights with respect to the child.

(b) If the declaration as to any of the above items is in the affirmative the declarant shall give additional information under oath as required by the court. The court may examine the parties under oath as to details of the information furnished and as to other matters pertinent to the court's jurisdiction and the disposition of the case."

Second, IC 31–1–11.6–6(b) states:

"(b) Before hearing the petition in a custody proceeding the court shall examine the pleadings and other information supplied by the parties under section 9 [31–1–11.6–9] of this chapter and shall consult the child custody registry established under section 16 [31–1–11.6–16] of this chapter concerning the pendency of proceedings with respect to the child in other states. If the court has reason to believe that proceedings may be pending in another state it shall direct an inquiry to the state court administrator or other appropriate official of the other state."

If the court becomes aware at the outset of the proceedings that the custody dispute has an interstate dimension, it must make a determination of subject matter jurisdiction pursuant to the Uniform Act. Moreover, the court may have a further duty to redetermine the matter of its jurisdiction at some later stage in the proceedings. IC 31–1–11.6–9(c):

"Each party has a continuing duty to inform the court of any custody proceeding concerning the child in this or any other state of which he obtained information during this proceeding."

and IC 31–1–11.6–6(c):

"If the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged in accordance with sections 19 through 22 [31–1–11.6–19—31–1–11.6–22] of this chapter. If a court of this state has made a custody decree before being informed of a pending proceeding in a court of another state it shall immediately inform that court of the fact. If the court is informed that a proceeding was commenced in another state after it assumed jurisdiction it shall likewise inform the other court to the end that the issues may be litigated in the more appropriate forum."

In confronting the issue of its own subject matter jurisdiction when it becomes aware of an interstate custody dispute, the court must engage in a multistep process to determine first, whether it has subject matter jurisdiction, and second, whether to exercise that jurisdiction. That procedure is based on the two tier approach to the issue of jurisdiction as set forth in *Campbell v.*

*Campbell, supra,* pursuant to IC 31–1–11.-6–3 and 1C 31–1–11.6–6, 31–1–11.6–7. The precise steps which a court should follow under the Uniform Act have been succinctly set out in *Carson v. Carson,* (1977) 29 Or. App. 861, 565 P.2d 763, 764–65:

> "Under the Act the court must go through a multistep process in determining whether to exercise jurisdiction. First it must ascertain whether it has jurisdiction under ORS 109.730. [IC 31–1-11.6–3] If it finds that there is jurisdiction, then the court must determine whether there is a custody proceeding pending or a decree in another state which presently has jurisdiction. If so, the Oregon [Indiana] court must decline to exercise its jurisdiction. ORS 109.-760(1) and 109.840(1). [IC 31 1-11.6-6] Finally, assuming the court has jurisdiction and there is not a proceeding pending or a decree, the court then must determine under ORS 109.770 and 109.780 [IC 31–1–11.6–7] whether to exercise its jurisdiction because of convenient forum." [Our insertions.]

*Accord: Etter v. Etter,* (1979) 43 Md.App. 395, 405 A.2d 760; *Vanneck v. Vanneck,* (1979) 68 A.D.2d 591, 417 N.Y.S.2d 258. Before proceeding in an interstate custody dispute, therefore, the court must determine its own subject matter jurisdiction as a matter of law.

◼ It is clear from the record in the instant case that the court made no determination of jurisdiction pursuant to the Uniform Act even though Gary alleged in his Petition for Order of Custody (1) that Wanda had moved to Bowling Green, Ken-

tucky, in August 1978; (2) that he was encountering difficulties in establishing visitation with Kim who had been in Bowling Green, Kentucky, since October 19, 1978; and (3) that he caused notice of the petition to be sent to Wanda at, *inter alia,* a Bowling Green, Kentucky, address. It appears that neither of the parties gave any consideration to the question of jurisdiction under the Uniform Act until appellant's motion to correct errors filed March 16, 1979. However, since the issue of subject matter jurisdiction may be raised at any time by either party or *sua sponte* by this court on appeal (*Campbell, supra; Paltrow v. Paltrow,* (1977) 37 Md.App. 191, 376 A.2d 1134), the trial court clearly erred in not determining on the record its own subject matter jurisdiction pursuant to the Uniform Act.[2]

It is equally apparent, however, from ample, uncontradicted evidence in the record that there was no other court which at the outset of the action could have exercised jurisdiction pursuant to the Uniform Act.[3] Had the court made a jurisdictional determination prior to either the December 1978 or the January 1979 hearing it would have found that it had subject matter jurisdiction as the "home state" of Kim. IC 31–1–11.6–3:

> "(a) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:
>
> (1) This state (A) is the home state of the child at the time of commencement of the proceeding, or (B) had been the child's home state within six [6] months before

---

**2.** While the transcript reflects that the court noted its subject matter jurisdiction under the theory of continuing jurisdiction at the outset of each proceeding, it is a well-known principle of law that a court speaks only through its order book. *State ex rel. Mammonth Development and Construction Consultants, Inc. v. Superior Court of Marion County,* (1976) 265 Ind. 573, 357 N.E.2d 732; *Blum's Lumber & Crating, Inc. v. James,* (1972) 259 Ind. 220, 285 N.E.2d 822; *Epps v. State,* (1963) 244 Ind. 515, 192 N.E.2d 459. There are no order book entries in the record as presented for review indicating that the court ever considered the subject of jurisdiction. This opinion should in no

way be construed to encourage the neglect of a trial court to make a proper record in *every* case.

**3.** While it is true that Kentucky had not adopted the Uniform Act at the commencement of this action, the Commissioners on Uniform Laws point out that "[t]he Act is not a reciprocal law. It can be put into full operation by each individual state regardless of the enactment [by] other states." 9 U.L.A., supra, at 114. Legislation proposing the adoption of the Uniform Act was introduced before the Kentucky legislature on January 8, 1980.

commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; . . . . "

IC 31–1–11.6–2(5):

" 'Home state' means the state in which the child, immediately preceding the time involved, lived with his parents, a parent, or a person acting as parent, for at least six [6] consecutive months, and in the case of a child less than six [6] months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six [6] month or other period."

Based on uncontroverted testimony from both sides, Indiana was Kim's home state. She had lived all seven of her years until October 19, 1978, in Indiana, having spent only the brief period of from July 24, 1978, until August 5 or 6, 1978, in Kentucky.

The "home state" concept adopted by the Uniform Act eliminates the residence/domicile distinction in conflict of law theories which plagues earlier custody cases. While courts continue to assert that they must have subject matter jurisdiction over the person of the child to determine custody matters, such jurisdiction need not be based on the physical presence of the child.

"In order to have the power to determine the right to custody as between litigants, a court must have subject-matter jurisdiction over the person of the child. [Citations omitted.] Subject matter jurisdiction can be based either on the domicile or residence of the minor child. [Citations omitted.] The domicile of a minor child whose parents have been divorced is deemed to be that of the parent who has been awarded custody. [Citations omitted.] His or her residence, on the other hand, cannot be so categorically determined."

In re Sagan, (1978) —— Pa.Super. ——, 392 A.2d 450, 452. Just as the physical presence of the child before the court without more no longer automatically confers jurisdiction on the court in a custody matter, the absence of the child does not automatically defeat the court's jurisdiction. The "home state" concept, then, confers subject matter jurisdiction over the person of the child without the necessity of physical presence. In re Sagan, supra.

The fact, therefore, that Wanda, the custodial parent had moved to Kentucky in August or September 1978 or the fact that Wanda refused to permit Kim to be brought into Indiana after the December 1978 hearing will not defeat the Indiana court's subject matter jurisdiction over the issue of Kim's custody. In fact, a situation precisely as we have it in this case was anticipated and resolved by Professor Bodenheimer, reporter for the committee which prepared the Uniform Act, as follows:

"A typical example is the case of the couple who are divorced in state A, their matrimonial home state, and whose children are awarded to the wife, subject to visitation rights of the husband. Wife and children move to state B, with or without permission of the court to remove the children. State A has continuing jurisdiction and the courts in state B may not hear the wife's petition to make her the sole custodian, eliminate visitation rights, or make any other modification of the decree, even though state B has in the meantime become the 'home state' under section 3. The jurisdiction of state A continues and is exclusive as long as the husband lives in state A unless he loses contact with the children, for example, by not using his visitation privileges for three years."

Bodenheimer, Uniform Child Custody Jurisdiction Act, (1969) 22 Vand.L.Rev. 1207, 1237. The first jurisdictional hurdle under the Uniform Act as interpreted by Campbell and Carson has been surmounted.

The second jurisdictional determination to be made by the court is whether "at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state . . . . " IC 31–1–11.6–6(a); Carson, supra. The

court, of course, is precluded from exercising its jurisdiction if there is a simultaneous proceeding in another state. Nothing in the ample record before us or in the allegations of the parties even remotely suggests that such could be the case here. It is difficult to imagine from these facts how or where such proceedings could have been instituted under either the Uniform Act or other traditional custody jurisdiction theories, since all parties—Gary, Wanda, and Kim—involved in the initial hearing were physically situated in Indiana. Likewise, before the January hearing Wanda still had physical, as well as legal, custody of Kim and would have had no reason to try to change that in a Kentucky court. Thus, the Owen Circuit Court would not have been precluded from the exercise of its jurisdiction under the Uniform Act since (1) it had subject matter jurisdiction as Kim's "home state" and (2) no prior custody proceeding had been initiated elsewhere.

The final test which may cause the court to decline to exercise its jurisdiction even though it is satisfied that it is competent to do so under the other provisions of the Uniform Act is that of inconvenient forum. IC 31-1-11.6-7. The Commissioners on Uniform Laws note that "[t]he purpose of this provision is to encourage judicial restraint in exercising jurisdiction whenever another state appears to be in a better position to determine custody of a child. It serves as a second check on jurisdiction once the test of section 3 [IC 31-1-11.6-3] or 14 [IC 31-1-11.6-14] has been met." 9 U.L.A., at 139. Under the facts of this case, at least at the outset of the action, there is nothing to indicate that the forum was inconvenient. In December 1978 all of the parties to the cause were located physically in Indiana. Both parties had filed their pleadings with the Owen Circuit Court, and it was only in her motion to correct errors that appellant raised the issue of inconvenient forum. Although we concur with Judge Robertson that parties are not able to confer subject matter jurisdiction on the court by agreement (*Campbell, supra*), the Uniform Act provides that the parties may agree on the more appropriate forum. IC 31-1 11.6-7(c)(4). Had the court made a jurisdictional analysis at the time of the January hearing, it could have found under the facts of this case that there was no more appropriate a forum in Kentucky and that, in fact, a Kentucky court would not have had subject matter jurisdiction under section 3 of the Uniform Act. (IC 31–1–11.-6-3) Furthermore, by the time of the April hearing a Kentucky court would probably have denied jurisdiction to Wanda under the "clean hands" section of the Act. IC 31 1-11.6-8. This section provides that a person who violates a custody decree of one jurisdiction will be denied access to the courts of another jurisdiction when seeking to modify the first court's decree. When she failed to obey the court's order to deliver Kim to Gary for weekend visitation on January 13, 1979, and when she failed to explain her noncompliance or to abide by the changed custody decree entered by the court on January 15, 1979, in the eyes of the Indiana court looking through the lenses of IC 31 1 11.6 8,[4] Wanda eliminated the possibility that a Kentucky court could have assumed jurisdiction. Thus, had the Indiana trial court made a jurisdictional determination at any point in the proceedings included in the record for review, it would have had to have concluded that it exclusively had jurisdiction to hear this case.

It should be remembered that the Uniform Act is a remedial statute whose purposes are set forth at IC 31–1–11.6–1:

"(a) The general purposes of this law are to:

(1) Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being;

(2) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child;

4. See footnote 3 above.

(3) Assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available, and that the courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state;

(4) Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child;

(5) Deter abductions and other unilateral removals of children undertaken to obtain custody awards;

(6) Avoid re-litigation of custody decisions of other states in this state insofar as feasible;

(7) Facilitate the enforcement of custody decrees of other states; and

(8) Promote and expand the exchange of information and other forms of mutual assistance between the courts of this state and those of other states concerned with the same child."

The entire chapter, in fact, is to be construed, according to the legislature, "to promote the general purposes stated in this section." IC 31–1–11.6–1(b). In the words of the Commissioners on Uniform Laws:

"[u]nderlying the entire Act is the idea that to avoid the jurisdictional conflicts and confusions which have done serious harm to innumerable children, a court in one state must assume major responsibility to determine who is to have custody of a particular child; that this court must reach out for the help of courts in other states in order to arrive at a fully informed judgment which transcends state lines and considers all claimants, residents and nonresidents, on an equal basis and from the standpoint of the welfare of the child. If this can be achieved, it will

be less important *which* court exercises jurisdiction but that courts of the several states involved act in partnership to bring about the best possible solution for a child's future."

9 U.L.A., at 114. The two principal purposes of the Uniform Act have been seen to be (1) discouraging forum shopping and (2) protecting the best interests of children. *Matter of Marriage of Settle*, (1976) 25 Or. App. 579, 550 P.2d 445, reversed on other grounds, 276 Or. 759, 556 P.2d 962. When a factual situation presents an irreconcilable conflict between promoting the orderly system of decisions and protecting the best interests of the child before the court, the Act makes predominant the best interests of the child. *Id.; See also Brock v. Brock*, (1977) Fla.App., 349 So.2d 782.

While it is difficult in most cases to determine what is "best" for a child, there is an impressive consensus among psychiatrists and psychologists that continuity and stability in relationships are important for children; experts admonish us that reform efforts in the area of custody legislation should be directed to the goal of insuring " 'that courts decide, decide promptly, and decide once and for all.' " Mnookin, *Child Custody Adjudication: Judicial Functions in the Face of Indeterminacy*, 39 Law and Contemporary Problems, 226 (1975), cited in Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modifications*, 65 Calif. L.Rev. 978, 983, (1977). Although it is almost impossible as a practical matter for custody determinations to be made "once and for all," it was no doubt to this end that the Indiana legislature enacted IC 31–1–11.-5–22(d)[5] in 1976 and the Uniform Act in 1977. *See Lovko v. Lovko*, (1978) Ind.App., 384 N.E.2d 166.

We recognize that the best interests of the child in this specific case require a prompt and lasting decision with regard to her custody. Furthermore, we are loath to

---

**5.** IC 31–1–11.5–22(d) provides that a modification of a custody decree shall be made "only upon a showing of changed circumstances so

substantial and continuing as to make the existing custody order unreasonable."

require the court below to perform the futile task of making a determination of its jurisdiction when it is clear from the record that there was no other court under the Uniform Act which would have had jurisdiction. We adhere to the wisdom expressed by Justice Hunter who, writing for our Supreme Court, said:

> "[a]lthough our procedural rules are extremely important, it must be kept in mind that they are merely a means for achieving the ultimate end of orderly and speedy justice. We must examine our technical rules closely when it appears that invoking them would defeat justice; otherwise we become slaves to the technicalities themselves and they acquire the position of being the ends instead of the means."

*American States Insurance Company v. State ex rel. Jennings,* (1972) 258 Ind. 637, 640, 283 N.E.2d 529, 531. We also agree with Judge Chipman who recently wrote: "[w]hen the judicial system becomes involved in family matters concerning relationships between parent and child, simplistic analysis and the strict application of legal principles should be avoided." *Collins v. Galbreath,* (1980) Ind.App., 403 N.E.2d 921. While it was error for the court not to have made a finding of jurisdiction, under the specific facts of this case we hold such error to be harmless. Because it is clear that this court alone had jurisdiction under the Uniform Act and because of the results reached on the following issues, we shall not remand on the issue of jurisdiction.

*Issue Two*

■■■ Appellant argues that the trial court erred in refusing to grant her Trial Rule 76(5) motion for change of venue filed after the court granted a hearing in response to her first motion to correct errors. It has long been recognized as part of the continuity theory as discussed above that a change of venue from the county shall not be permitted in actions seeking a modification of custody orders. *Stone v. Stone, supra; Haag v. Haag,* (1959) 240 Ind. 291, 163 N.E.2d 243; *State v. Greene Circuit Court,* (1964) 245 Ind. 1, 195 N.E.2d 776.

This is still the law in Indiana today. *State ex rel. Greebel v. Endsley,* (1978) Ind., 379 N.E.2d 440. While the venue issue may now be related to the issue of the court's jurisdiction under the Uniform Act, it is a matter for the court's determination and is not an automatic right. *See* footnote 1 *supra.* Appellant seems to have made the common error of confusing the change of venue from the county aspect of Trial Rule 76 with the absolute right to change of judge provided by the Rule. The two are not synonymous. *Julian v. Julian,* (1916) 60 Ind.App. 520, 111 N.E. 196; *Heller v. Heller,* (1962) 133 Ind.App. 259, 181 N.E.2d 530; *State v. Greene Circuit Court, supra.* There was no error in the trial court's denial of appellant's motion for change of venue.

*Issue Three*

Appellant contends that, assuming there is no issue of jurisdiction, the court erred in modifying the original custody award not only because there was no evidence of a continuing and substantial change in circumstances, but also because the court failed to make a specific finding of such change. She further argues that the trial court improperly based its modification on punitive motives rather than on the best interests of the child.

■■■ We agree with appellant that an award of custody may not be made or changed in order to punish a parent. The Supreme Court of this state has said:

> "that violation of a custody decree *alone,* nothing else appearing (*which is not the case here*), is not sufficient basis for modifying a child custody decree for it does not, by itself, establish what will serve the best interests of the child which must always be the paramount concern of the court. We reiterate that 'the custody of children cannot be used as a means of punishing the parents. It is the children's welfare—not the parents'—that must control the actions of the court.' *Wible v. Wible,* (1964) 245 Ind. 235, 237, 196 N.E.2d 571, 572."

*Marshall v. Reeves*, (1974) 262 Ind. 107, 311 N.E.2d 807, 809–10, supplemented as to costs, 262 Ind. 403, 316 N.E.2d 828. We should remind appellant, however, that her burden on appeal is a heavy one; she must show not merely that the evidence *might* support her allegation, but that it *positively requires* her conclusion before we may reverse. *Brickley v. Brickley*, (1965) 247 Ind. 201, 210 N.E.2d 850; *Marshall v. Reeves, supra.* We do not find that the evidence requires her conclusion that the court based its modification on punitive motives, and we therefore hold that appellant may not prevail on this issue.

We must remind appellant also of the distinction between the functions of the trial and appellate courts with regard to the sufficiency of the evidence in a case such as hers. Appellant appears to have confused lack of evidence in the record to support the court's judgment with failure of appellee to meet his burden of proof in the court below.

> "It is the duty of the trial court to determine whether there was a change in conditions which warranted a change in custody. This court's function on appeal is to examine the decision of the trial court and determine whether the record discloses evidence or reasonable inferences to be drawn therefrom which serve as a rational basis to support the finding of the trial court. *Leohr v. Leohr*, (1974), Ind.App., 316 N.E.2d 400."

*Franklin v. Franklin*, (1976) Ind.App., 349 N.E.2d 210, 213.

▪ From the evidence in the record set out above in the light most favorable to the appellee we cannot say that there is no evidence or reasonable inference therefrom to support the judgment of the trial court. Neither can we say that the evidence positively requires the conclusion contended by appellant. Uncontested evidence established that since the initial custody agreement there have been continuing and substantial changes in the circumstances upon which the modification could be made. We shall not here reweigh the evidence or judge the credibility of witnesses. *Geberin v. Geberin*, (1977) Ind.App., 360 N.E.2d 41;

*In re the Marriage of Julien*, (1979) Ind. App., 397 N.E.2d 651. The facts are that Gary has remarried and settled into a three bedroom home with his current wife and her two children. Kim gets along fine with them and seems to enjoy their company. She had, at age seven, nearly ceased bed wetting while spending the summer with them. On the other hand, since the divorce Wanda has moved at least seven times, changed jobs at least as frequently, has had an abortion, and has been hospitalized for taking an overdose of aspirin after breaking up with her boyfriend. Kim frequently cried at being returned to her mother, and had resumed wetting the bed at night. We hold that such changes in the parties' circumstances were of a sufficiently continuing and substantial nature as to support a change in custody. Appellant's allegation that there is *no* evidence to support the court's determination is groundless.

▪ Likewise, appellant's contention that the court committed error in failing to make specific findings of fact regarding the continuing and substantial changes in the parties' circumstances is without foundation. This is not such a case as to require the trial court, absent a request, to make special findings. *See* Ind.Rules of Procedure, Trial Rule 52(A); *Campbell v. Campbell, supra; Stevenson v. Stevenson*, (1977) Ind.App., 364 N.E.2d 161. Trial Rule 52(A) requires that a request for special findings be made in a case such as this by one of the parties (1) in writing and (2) prior to the admission of evidence. Appellant's request for immediate findings was made in conjunction with Trial Rule 41(B) motion. Only where such motion is granted need the court make specific findings pursuant to Trial Rule 52(A) if so requested by a party. *See* T.R. 41(B) and T.R. 52(A). Thus, even if appellant's Trial Rule 41(B) motion could be construed as a motion for specific findings there was no requirement that the court make such findings since it did not grant appellant's motion. T.R. 41(B).

*Issue Four*

▪ Appellant argues that the court erred in denying her Trial Rule 41(B) Mo-

tion for an Immediate Finding in that the modification was contrary to the evidence. Any error by the trial court in denying appellant's motion for an involuntary dismissal was waived by her proceeding to present her own evidence. *Burger Man, Inc. v. Jordan Paper Products, Inc.*, (1976) Ind.App., 352 N.E.2d 821; *Foreman v. State ex rel. Dept. of National Resources*, (1979) Ind.App., 387 N.E.2d 455.

*Issue Five*

 Appellant contends that she was denied her right to due process of law under both the Federal and Indiana Constitutions when the court denied her motion for a continuance. Ind.Rules of Procedure, Trial Rule 53.4 reads in pertinent part:

"Upon motion, trial may be postponed or continued in the discretion of the court, and shall be allowed upon agreement of all the parties or upon a showing of good cause established by affidavit or other evidence."

The burden was upon appellant in this case as the moving party to establish "good cause" thereby requiring the court to grant such continuance. *Farley v. Farley*, (1977) Ind.App., 359 N.E.2d 583. Where, as in this case, no cause was shown for appellant's absence, *i. e.*, the need for a continuance, and where there was no agreement by the parties to a continuance, the granting of a continuance on some other non-statutory ground was clearly within the discretion of the trial court. *Works v. State*, (1977) Ind., 362 N.E.2d 144; *Butler v. State*, (1978) Ind. App., 372 N.E.2d 190. Where the denial of such motion is within the discretion of the trial court, the ruling will not be reversed except for abuse. *Dockery v. State*, (1974) 161 Ind.App. 681, 317 N.E.2d 453. We shall not say that the court as a matter of law abused its discretion in not granting the continuance requested when no cause was shown for appellant's absence and thus for the necessity of a continuance. Appellant will not be heard to complain that she had no chance to present her evidence when she had proper notice of the hearing, but failed to appear or even to give a reason for her failure to appear. *Loeser v. Loeser*, (1974) 160 Ind.App. 236, 311 N.E.2d 636, *cert. den.*, 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822.

*Issue Six*

 Appellant contends that the court erred in basing its decision on improperly admitted hearsay evidence. Specifically appellant objects on the basis of hearsay to the court's permitting Linda and Gary to answer "yes" or "no" when asked whether they had opinions on certain matters. The opinions would necessarily have been based on hearsay. Neither party, however, testified as to what the opinion was that he or she held. Whether or not one has an opinion or knowledge about a matter is based on one's own perception of what is in one's own mind, thus is a fact which can be known solely by the declarant. *See* VII Wigmore on Evidence § 1964 (Chadbourn Rev., 1978). This is true even if the opinion or knowledge itself is based on hearsay. While whether or not one has an opinion may be an objectionable question on other grounds, such as relevance or competence,[6] it is not objectionable as hearsay. It is a well known rule that an objection to the admissibility of evidence must denote the grounds for the objection with specificity. 28 I.L.E. *Trial* § 64 (1960); *Fuller v. Fuller*, (1913) 52 Ind.App. 488, 100 N.E. 869; *Gradison v. State*, (1973) 260 Ind. 688, 300 N.E.2d 67. Where one specifies a certain ground for an objection, the implication arises that there are no other grounds or if there are, they are waived. *Reed v. Trainor*, (1968) 142 Ind.App. 192, 233 N.E.2d 685; *Smith v. State*, (1980) Ind.App., 403 N.E.2d 869. The court in this case properly permitted Linda and Gary to respond as to whether each had an opinion and properly rejected any attempt by each to render what that opinion might be. Therefore, there was no error committed in these specific instances, because no hearsay testimony was admitted. Appellant's failure to cite any specific instances of actual hearsay testimony in the record upon which she contends that the

---

6. *See* VII Wigmore, §§ 1917 and 1919.

trial court based its conclusions precludes our giving further consideration to this issue. Ind.Rules of Procedure, Appellate Rule 8.3(A)(7).

*Issues Seven and Eight*

 Issues seven and eight concern the trial court's rulings on matters of contempt of court. Appellant contends that the trial court abused its discretion both in overruling her Motion for Rule to Show Cause and in issuing a Body Attachment for her arrest. The punishing or refusal to punish for contempt is generally a matter within the discretion of the trial court. 23 A.L.R.3d *Appealability of Acquittal from or Dismissal of Charge of Contempt of Court,* 650 (1969). Our review of matters within the discretion of the trial court will result in reversal only where there is no rational basis for the trial court's action, *i. e.,* where the court's action "is clearly against the logic and effect of the facts and circumstances before the court, including the reasonable inferences that might be drawn therefrom." *In re Marriage of Osborne,* (1977) Ind.App., 369 N.E.2d 653, 656, as cited in *Libunao v. Libunao,* (1979) Ind. App., 388 N.E.2d 574, 575, *reh. den.* Ind. App., 390 N.E.2d 695. Again, it should be emphasized that we shall not weigh the evidence or determine the credibility of witnesses on review, and we shall consider the evidence only in the light most favorable to the appellee. *Geberin v. Geberin, supra.* Thus, if there is a rational basis upon which the trial court's action may be affirmed, we shall do so. *Lovko v. Lovko, supra; Franklin v. Franklin, supra.* In order for a person to be punished for being in contempt of a court's order there must be an order or decree commanding the accused either to do or to refrain from doing something. 17 C.J.S. *Contempt* § 7 (1963). If there is no other, there can be no violation of a nonexistent order. *Schultz v. State,* (1949) 227 Ind. 33, 83 N.E.2d 784. While the ordinary method of enforcing custody and visitation privileges is by means of a contempt proceeding, if the provisions of the divorce decree concerning custody and visitation are indefinite, they may not be the basis of a contempt proceeding. 24 Am.Jur.2d *Divorce and Separation* § 796 (1966).

"The provisions of a divorce decree concerning custody or visitation rights should be definite and certain. If the decree is indefinite it invites a controversy as to the rights and duties of the parents; and it may be too indefinite to be enforced. An order or judgment which merely declares the rights of the parties in regard to custody and visitation, without any express command or prohibition cannot be the basis of contempt proceedings. After the court states the rights of the parties in an order or judgment it should state its orders or prohibitions. The portions of the decree relating to visitation rights should spell out the times, places, and circumstances of visitation, and a decree that defendant shall have the right to visit his children 'at reasonable times and places' is too indefinite to be enforced."

*Id.* at 903. The agreement entered into between Gary and Wanda in the instant case and made a part of the court's decree is typical of the type described above. It provides that custody of Kim is placed in Wanda and "[t]he parties agree that it is in the best interest of the child and the parties herein not to have formal visitation hours, but to allow visitation at the convenience of the child and the parties herein." Such a provision in a decree is much too vague to be construed as an order of the court which would support a finding of contempt. There being no enforceable order of the court embodied in the language of the decree and Gary having returned Kim to Wanda at the conclusion of the December 11, 1978, emergency hearing upon the court's direct order, the trial court did not abuse its discretion in refusing to grant Wanda's Motion for Rule to Show Cause.

 Neither did the court err in issuing a Body Attachment for Wanda's arrest after she both failed to comply and failed to explain her noncompliance with the court's direct order to her made in open court on January 12, 1979. Ind.Rules of Procedure, Trial Rule 64(A) provides that

"[a]t the commencement of and during the course of an action all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances in the manner provided by law and existing at the time the remedy is sought."

Although appellant is correct in asserting that there may be circumstances under which she would be justified in disobeying a court order, such justification could not be implied from the fact of disobedience itself. Moreover, a court's power to arrest for contempt is not to be considered as a method of punishment, as appellant contends, but is merely a means of securing compliance with its own order. 17 C.J.S. *Contempt* § 76 (1963). While testimony regarding weather and road conditions in Kentucky the weekend of January 12–15, 1979, was conflicting, there was no evidence as to whether this or some other reason prevented Wanda from complying with the court's order or from appearing before the court at a later time to explain her failure to comply. What appellant is requesting on appeal is that we weigh the evidence and judge the credibility of the witnesses. This we decline to do. We hold that the court did not commit error in issuing a Body Attachment for appellant's arrest.

Judgment affirmed.

ROBERTSON, P. J., and NEAL, J., concur.