In re the MARRIAGE OF Susan HUDSON (Petitioner Below),

**and**

**Ronald R. Hudson (Respondent Below).**

**No. 1–1080A310.**

Court of Appeals of Indiana, Fourth District.

April 21, 1982.

Rehearing Denied May 26, 1982.

---

Rosenfeld, Wolfe, Frey & Hunt, Eric A. Frey, Terre Haute, for appellant.

Bolin Trueblood & Rennolet, Barbara Coyle Rennolet, Terre Haute, for appellee.

MILLER, Presiding Judge.

Respondent-husband Ronald R. Hudson appeals from a trial court's judgment in a dissolution proceeding which 1) dissolved the parties' marriage 2) distributed the marital property and 3) awarded custody of their three children to Petitioner-wife Susan C. Hudson. Specifically Ronald contends the trial court lacked jurisdiction over all three matters claiming 1) Susan did not satisfy the six month's residency requirement for obtaining a dissolution decree; 2) Susan did not maintain continuous residency in Indiana and therefore the trial court lacked jurisdiction to distribute the marital property; and 3) the trial court did not possess jurisdiction to award custody of the parties' children under the Uniform Child Custody Jurisdiction Law and any such assertion of jurisdiction would violate his due

process rights. We hold the trial court was vested with jurisdiction to dissolve the marriage but lacked jurisdiction to distribute the bulk of the marital assets. We additionally find that, at the time Susan's petition for dissolution was filed, the trial court was vested with jurisdiction to determine custody of the parties' children, given Susan's and the children's significant connections with Indiana. We therefore affirm in part, reverse in part and remand for further proceedings.

### FACTS

We initially note that a transcript of the hearing on Susan's petition was not certified for our consideration on appeal. Our review of the facts is therefore limited to the pleadings and the transcript of a hearing on Ronald's motion to dismiss for lack of subject-matter and *in personam* jurisdiction.

The facts most favorable to the trial court's judgment are the following. Susan was a life-long resident of Indiana at the time of her marriage to Ronald in January of 1975. The parties were married in Bloomington, Indiana and initially resided there for approximately one and a half years. At the time of their marriage, Susan had custody of Christine, her natural child from a former marriage, whom Ronald legally adopted. Ronald was enlisted in the United States Navy and was transferred to Iceland in mid-1976 where the parties and Christine resided for approximately two and a half years. While living in Iceland, the parties had two children, Thomas and Monique.

In 1978 Ronald was transferred to the State of Washington for a one year program at the University. While Ronald attended school, the parties and their three children resided in Bremerton, Washington for nine months until July of 1979. At that time, Susan returned to her parents home in Indiana and lived there for approximately one and a half months. According to her testimony she returned to Washington in August of 1979 in order to encourage Ronald to seek marriage counseling, to gather some additional personal possessions and to arrange for Ronald to set up a home, separate from her parents, for her and the children in Indiana until their marital difficulties could be worked out. After four months in Washington, Susan returned to Indiana in December of 1979 with the children where she has since resided.

Ronald continuously claimed Oregon as his voting and legal residence. The parties, however, never lived together in Oregon except for a brief period during which they stayed with his parents while they set up housekeeping in Washington. In January of 1980, Ronald was transferred to a military installation in Rota, Spain. Susan and the children continued to reside in Indiana. On March 12, 1980, Ronald apparently forcibly removed Monique and Thomas from Susan's custody and took them back to Spain where they still resided at the time of the trial court's judgment.

On the same day Ronald seized the two children, which was approximately eight months after Susan's initial return to Indiana, Susan filed a petition for dissolution and child custody in the Vigo Superior Court in Indiana. Ronald was served notice of the proceedings by mail on March 24, 1980. On April 11, 1980 counsel for Ronald appeared and filed a motion to dismiss for lack of subject-matter and *in personam* jurisdiction. After a hearing and after the submission of briefs and memoranda, the trial court denied the latter motion and set the petition for hearing. On July 15, 1980 the trial court entered a decree of dissolution, distributed all the marital property and awarded Susan custody of the three children. Thereafter Susan petitioned for issuance of a rule to show cause stemming from Ronald's alleged failure to relinquish custody of Monique and Thomas and to pay support as had been ordered by the trial court. Ronald moved for a stay of proceedings to enforce the trial court's judgment, under Ind. Rules of Procedure, Trial Rule 62(B)(1), pending a ruling on his motion to correct errors and any further appellate proceedings. Both the trial court and this Court overruled his request for a stay.

Ronald appeals from the trial court's rulings raising the following issues for review:

1) Did the trial court possess jurisdiction to dissolve the parties' marriage?

2) Did the trial court possess jurisdiction to distribute the parties' property?

3) Did the trial court possess jurisdiction under the Uniform Child Custody Jurisdiction Act to award custody of the parties' three children?

4) Did the trial court err in refusing to consider Ronald's motion for a stay of proceedings to enforce its custody and support orders?

## DECISION

*Dissolution*

Ronald contends the facts do not support the trial court's determination that Susan was a resident of Indiana for six months preceding the filing of her petition for dissolution.[1] In this regard, Ronald first argues that upon their marriage Susan acquired Ronald's domicile since she did not maintain physical presence in Indiana and evidenced no intent to establish Indiana as her separate domicile. He therefore argues Susan's requisite physical presence and intent to establish a separate domicile in Indiana did not occur until December of 1979 since she had not *continuously* resided in Indiana after her initial return to her parents' home in July of that year. We cannot agree with Ronald's latter conclusion.

■ We acknowledge the general rule in Indiana presumes the wife's residence "follows" that of the husband. *In re Marriage of Rinderknecht*, (1977) Ind.App., 367 N.E.2d 1128, 1132; *accord Curtis v. Curtis*, (1891) 131 Ind. 489, 30 N.E. 18. However, it is also recognized that strict adherence to the rule is inconsistent with the Married Women's Property Acts according women full legal capacity; it is unseemly reminiscent of the long discredited fictional identity of husband and wife.[2] I Moore's Federal Practice ¶ 0.74[6.1] (2d ed. 1981) and cases cited therein. The majority of jurisdictions, including Indiana, have therefore concluded a married woman may establish a residence or domicile separate from her husband for whatever reason, and the usual test for determining a party's residence may apply. *In re Marriage of Rinderknecht, supra.*

■ Applying this test in the case at bar, we find the evidence was sufficient to support the trial court's determination that Susan was an Indiana resident at the time she filed her petition for dissolution. As explained in *Rinderknecht*:

" 'It is the general rule in construing a statute which prescribes residence as a qualification for the enjoyment of a privilege, or the exercise of a franchise, that domicile and residence are deemed to be equivalent or synonymous, i.e., that the word residence is deemed to mean domicile. . . .

The term domicile in a strict legal sense has been defined as the place where a person has his true, fixed, permanent home and principal establishment, *and to which place he has, whenever he is absent, the intention of returning.* Ballentine Law Dictionary, p. 400. *To acquire a domicile of choice, there must be an actual residence in a particular place together with an intention to remain there.* A place cannot serve as a domicile merely by force of bodily presence there when it is unaccompanied by an intention to live there permanently, or at least indefinitely. 11 I.L.E., 'Domicile,' § 2, p. 3. As distinguished from domicile, residence

1. Ind.Code 31–1–11.5–6 provides:

"Residence and Venue. (a) At the time of the filing of a petition pursuant to section 3(a) of this chapter, at least one (1) of the parties shall have been a resident of the state or stationed at a United States military installation within the state for six (6) months immediately preceding the filing of each petition."

2. In *Brokus v. Brokus*, (1981) Ind.App., 420 N.E.2d 1242, 1245 this Court implied that the spouse of a person enlisted in the military who travels from state to state under military orders might be found to have maintained residence in the state of his or her last separate domicile. The *Brokus* Court, constrained by the trial court's findings of fact, was unable to reach this issue.

may be any place of abode or dwelling regardless of how temporary . . . .'" (Emphasis added.)

*Id.* at 1131–32, *quoting Board of Medical Registration & Examination v. Turner,* (1960) 241 Ind. 73, 79–80, 168 N.E.2d 193, 196–97. Although Susan concedes in her brief that after initially living in Indiana for a year and a half she "did not continuously reside in Indiana after the parties were transferred to Iceland," she does point out that the evidence demonstrates she moved to her parents' home in Indiana in July of 1979, approximately eight months before she filed a petition for dissolution. She brought some personal possessions to Indiana at that time and left in August for the sole purpose of arranging her affairs in Washington and with the intention of returning to Indiana for an indefinite period of time. Further, upon her return to Indiana she registered (at an unspecified time) to vote in Indiana. With due regard to the trial court's ability to determine the credibility of witnesses, *In re Marriage of Julien,* (1979) Ind.App., 397 N.E.2d 651, we believe the evidence supported the court's exercise of jurisdiction over the marital status of the parties.

*Property Distribution*

The trial court's decree of dissolution also distributed the parties' marital property, both real and personal, pursuant to Susan's petition. Except for a few of Susan's personal belongings, the bulk of the parties' personalty, which included an automobile and household furnishings, was located in Spain at the time of the hearing. The parties also retained an interest in two parcels of realty located in Washington and Oregon. As previously noted, Susan only recently resumed Indiana residency and Ronald was an Oregon resident stationed in Spain. Under these facts we find the trial court lacked jurisdiction to distribute the marital property.

A party's residence in this state constitutes sufficient contact to provide a trial court with jurisdiction over the parties' marital status, but it is not sufficient to confer jurisdiction to distribute the parties'

marital assets if the other party is a nonresident. *In re Marriage of Rinderknecht, supra.* An analogous situation was presented in *Rinderknecht,* where the husband, a member of the armed forces, continuously maintained Indiana residency. However, the parties never lived in the marital relationship in Indiana and the wife was a Nebraska resident. The Indiana trial court therefore lacked jurisdiction to distribute the marital property since *in personam* jurisdiction over both parties is traditionally required when adjudicating the incidences of marriage. *Id.* at 1133 *citing Estin v. Estin,* (1948) 334 U.S. 541, 68 S.Ct. 1213, 92 L.Ed. 1561. A court obtains such jurisdiction if there are certain "minimum contacts" between the state and the party over whom the state seeks to exercise control. *In re Marriage of Rinderknecht, supra citing International Shoe Co. v. Washington,* (1945) 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95. Generally, for purposes of distributing the marital property, this minimum contact requirement may be met under Ind. Rules of Procedure, Trial Rule 4.4(A)(7), *Id.,* which provides as follows:

"(A) Acts serving as a basis for jurisdiction. Any person or organization that is a nonresident of this state, or a person whose residence is unknown, submits to the jurisdiction of the courts of this state as to any action arising from the following acts committed by him or his agent:

.     .     .     .     .

(7) *living in the marital relationship within the state notwithstanding subsequent departure from the state,* as to all obligations for alimony, custody, child support, or property settlement, *if the other party to the marital relationship continues to reside in the state."* (Emphasis added.)

Susan relies principally on this provision by alleging the parties lived in Indiana for one and a half years at the beginning of their marriage. But as noted earlier she also concedes in her brief that she "did not reside continuously in Indiana after the parties were transferred to Iceland." We

must note the above rule conditions jurisdiction over the nonresident under this subsection to instances where the other party *continues* to reside in Indiana.

■ In construing this provision we must give effect to the plain meaning of the language used. *E.g.*, Ind.Code 1–1–4–1. From this view of the rule, it is apparent that the party must maintain *continuous* residency in Indiana. This view of the rule is supported by judicial constructions of the virtually identical rule in Kansas which served as the pattern for T.R. 4.4(A)(7). Civil Code Study Commission Comments, 1 W. Harvey, Indiana Practice at 298 (1969); *Id.* at § 4.4(D) at 71 (Supp.1980). It is presumed that when language or statutes are adopted from a sister state, the constructions placed upon such language or statutes are adopted as well. *Matter of City Investing Co.*, (1980) Ind.App., 411 N.E.2d 420. Before its adoption in Indiana, Kansas rule K.S.A. 60–308(b)(8) had been construed as requiring continuous residency which precluded a spouse's change of residence between the time the parties lived in the marital relationship and the resumption of residency before the petition for dissolution was filed. *E.g., Scott v. Hall*, (1969) 203 Kan. 331, 454 P.2d 449. We therefore cannot accept Susan's contention that her *return* to Indiana in July of 1979 satisfied the requirements of T.R. 4.4(A)(7).[3]

■ Susan proposes two alternative theories to support the trial court's exercise of jurisdiction over the parties' marital property. She first argues a party may voluntarily submit to a court's personal jurisdiction by either failing to make a timely objection or by seeking affirmative relief. *Killearn Properties, Inc. v. Lambright*, (1978) Ind. App., 377 N.E.2d 417. The record, however, discloses Ronald first filed a motion to dismiss under Ind. Rules of Procedure, Trial Rule 12(B)(1) and (2) in response to Susan's petition, entering a "special appearance" solely for the purposes of contesting the court's jurisdiction, both *in personam* and over the subject-matter. As explained in *In re Marriage of Rinderknecht, supra* at 1136, fn. 11:

> "If the defendant has made a timely challenge of the court's *in personam* jurisdiction in his answer or by filing a TR 12(B)(2) motion, he does not, by addressing the merits of the case, waive any issue as to personal jurisdiction, and such issue may properly be raised on appeal, together with any other issues which have been properly preserved."

We must therefore conclude Ronald did not waive the issue of the trial court's *in personam* jurisdiction.

■ Susan also asserts Ronald is estopped from challenging the trial court's *in personam* jurisdiction due to his alleged testimony advising the trial court that, (according to Susan's brief) "he would abide by the trial court's decision concerning the matter of child custody."[4] Susan characterizes this statement as a request for affirmative relief from the trial court. We cannot agree. These circumstances are vitally different from those in *Kelley v. Kel-*

3. We note that *Rinderknecht* involved only the distribution of personal property. It did not address the possibility of distributing real property located in Indiana under the provisions of T.R. 4.4(A)(5) regarding jurisdiction in actions concerning possession or interest in real property within this state. It appears a trial court could distribute such property pursuant to its *in rem* jurisdiction. As explained in *Shaffer v. Heitner*, (1977) 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683, which extended the minimum contacts standard of *International Shoe, supra*, to *in rem* actions:

> "[T]he presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation. For example,

when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction. In such cases, the defendant's claim to property located in the State would normally indicate that he expected to benefit from the State's protection of his interest."

*Id.* 433 U.S. at 207–08, 97 S.Ct. at 2581–82. In the instant case, however, the parties' marital property did not include real estate in Indiana.

4. That portion of the record allegedly containing Ronald's testimony has not been brought before us on appeal.

*ley,* (1979) Ind.App., 387 N.E.2d 452, on which Susan relies, where the nonresident defendant submitted an agreed entry on child custody for the court's approval. The defendant's submission in *Kelley* effectively requested the trial court to affirmatively exercise jurisdiction in the cause. Under such circumstances the defendant was estopped from denying the trial court was possessed with *in personam* jurisdiction in the first place. In contrast Ronald's ambiguous testimony in the instant case appears to be simply a recognition of the court's integrity by promising to abide by its *lawful* orders. We find nothing in the statement affirmatively requesting the trial court to exercise its jurisdiction. Surely such a statement neither waived nor erected an estoppel against Ronald's defenses to the trial court's actions at trial or on appeal.

We must conclude the trial court lacked *in personam* jurisdiction over Ronald. Consequently that portion of the decree which distributed the marital property must be reversed.[5]

*Child Custody*

Ronald also contends the trial court lacked jurisdiction to award custody of the parties three minor children. He first argues Indiana did not acquire jurisdiction under the provisions of the Uniform Child Custody Jurisdiction Law (UCCJL). Alternatively, Ronald contends the trial court's exercise of jurisdiction under the UCCJL violated his due process rights. We disagree with both contentions.

A child custody proceeding may be commenced pursuant to the filing of a petition for dissolution. Ind.Code 31–1–11.5–20; *Brokus v. Brokus,* (1981) Ind.App., 420 N.E.2d 1242. Jurisdiction of a child custody proceeding instituted in this manner is determined by reference to the UCCJL, Ind. Code 31–1–11.6–6 *et seq.* IC 31–1–11.5–20.[6] Specifically, the UCCJL provides in pertinent part:

"Jurisdiction. (a) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(1) this state (A) is the home state of the child at the time of commencement of the proceeding, or (B) had been the child's home state within six (6) months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or

(2) it is in the best interest of the child that a court of this state assume jurisdiction because (A) the child and his parents or the child and at least one (1) contestant, have a significant connection with this state, and (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

(3) the child is physically present in this state and (A) the child has been abandoned or (B) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(4) (A) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2) or (3), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (B) it is in the best interest of the child that this court assume jurisdiction.

(b) Except under paragraphs (3) and (4) of subsection (a), physical presence in

---

**5.** Although neither party raises the question, we note that pursuant to *Rinderknecht,* the trial court was nevertheless possessed with jurisdiction to distribute property in which Susan had the sole interest. Whether such rule is applicable in the case at bar is for the trial court's determination.

**6.** The UCCJL is Indiana's version of the Uniform Child Custody Jurisdiction Act (hereinafter referred to as the Uniform Act) reported at 9 Uniform Laws Annotated 107 (1972 Master ed.)

this state of the child, or of the child and one (1) of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.

(c) Physical presence of the child, while desirable, is not prerequisite for jurisdiction to determine his custody."

IC 31–1–11.6–3. Ronald first contends none of the above provisions apply in the case at bar and therefore the trial court lacked subject-matter jurisdiction or, more specifically, jurisdiction over this particular controversy. Ronald alternatively contends jurisdiction rests in either Washington or Oregon who are also signatories to the Uniform Act.

Ronald's challenge necessitates a close examination of the UCCJL's jurisdictional provisions. The first and second provisions of the jurisdictional section, quoted above, provide the two major bases for jurisdiction: the "home state" test and the "significant connections" test. Commissioners' Note, 9 Uniform Laws Annotated at 123.[7] These two tests provide alternative bases for jurisdiction. *Id.*

"Home state" is defined in IC 31–1–11.6–2(5) as follows:

" '[H]ome state' means the state in which the child, immediately preceding the time involved, lived with his parents, a parent, or a person acting as parent, for at least six (6) consecutive months, and in the case of a child less than six (6) months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six (6) month or other period."

Neither party claims Indiana was the children's home state, within the statutory definition, at the time Susan's petition was filed on March 12, 1980. Apparently Susan did not bring all three children to Indiana when she initially separated from her hus-

band in July of 1979. Although all three children resided with Susan in Indiana from December of 1979 until Ronald unilaterally removed the two youngest children to Spain on March 12, 1980 it appears the children had not resided in Indiana for the requisite six month period.

■ Ronald argues either Oregon or Washington would satisfy the home state test at the time the proceedings were begun. We cannot agree. None of the children resided in Oregon except for a brief period while the parties looked for a house in Bremerton, Washington. Furthermore, at the time the proceedings were commenced none of the children had resided in Washington for the past three months. Although *temporary* absences may be included under the home state test, IC 31–1–11.6–2(5), neither party evidenced any intention to return to Washington. Ronald was stationed in Spain and had maintained residency in Oregon, not Washington, and Susan had established residency in Indiana. These latter facts also defeat home state jurisdiction in these foreign states under IC 31–1–11.6–3(a)(1)(B). Under that provision a state which would satisfy the home state test except for the children's absence retains jurisdiction for an additional six months *if a parent continues to reside in that state.* Neither Susan nor Ronald, however, continued to live in Washington. We must conclude there is no state which qualified as the children's home state at the time the proceedings were commenced in Indiana.

We must therefore turn to the "significant connection" provision of IC 31–1–11.6–3(a)(2). This alternative basis for jurisdiction was specifically drafted to come into play *when the child has been recently removed from his or her home state and the remaining spouse has also moved away.* Commissioners' Note, 9 Uniform Laws Annotated at 123.[8] Under this test, the state

---

7. IC 31–1–11.6–3, quoted above, is identical to paragraph three of the Uniform Act. We therefore find the Commissioners' notes particularly helpful.

8. As pointed out by the Commissioners, the operation of the significant connection test under such circumstances is also emphasized by the last clause of the home state provision, which provides for jurisdiction under the home

with jurisdiction is the one which has maximum access to relevant evidence regarding the child's "present or future care, protection, training, and personal relationships." IC 31–1–11.6–3(a)(2)(B).

In this regard, Ronald appears to propose a strictly quantitative approach, contending Washington is the more appropriate forum since the children and their parents lived there for approximately nine months before the parties left that state in late 1979. At the time of the proceedings, the parties' children, Christine Susan, Thomas Clifford and Monique Ann were approximately 8, 3 and 1½ years old respectively. Although the two youngest children had therefore spent a relatively significant portion of their lives in Washington, we do not believe this fact alone is dispositive.

The significant connection test requires more than a strictly quantitative analysis. The UCCJL was designed to place the issue of custody in the forum most appropriate to determine the best interests of the children. Brigitte M. Bodenheimer, "The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws," 22 Vand.L.Rev. 1207, (1969) (hereinafter referred to as "Bodenheimer"). As explained by the reporter for the Uniform Act who is recognized as a leading authority on its provisions: "the most significant evidence will have to come from the parents themselves, from other persons who might be entrusted with the care of the child, and from those who can testify about the competence of these persons as custodians." *Id.* at 1223. The Act is expressly concerned not only with the past care of the children, but with their *present* and *future* care. IC 31–1–11.6–3(a)(2)(B). To this extent, the forum should have access to information concerning the

state theory only where a parent continues to reside in the home state. IC 31–1–11.6–3(a)(1)(B).

**9.** Bodenheimer concedes the resolution under a similar set of circumstances would be uncertain:

"Consider another illustration: suppose the matrimonial home is in state A, and the husband remains there. The wife and children

affect on the children of materially changed circumstances.

■ In the instant case, we find it particularly significant that both parties permanently left Washington. At the time of the hearing, neither the parents nor their children had any connection with Washington for at least over four months. The children were not merely physically present in Indiana. Susan was not a temporary visitor to this state, but established residency here with her parents. More significantly, the parties lived in Indiana as a family in the not too distant past for a year and a half, and Christine, the eldest child, lived in Indiana for all but three years of her life. All three children were currently living in Indiana with their mother at their grandparents' home until Ronald's unilateral removal of the two youngest children. Christine attended school here and Thomas attended preschool in Indiana. Indiana therefore had ready access to substantial relevant evidence concerning not only the past conduct of the parties but the present and future circumstances of both Susan and the three children. In contrast, the only evidence concerning Ronald's present and future care of the children existed not in Washington but in Spain, where he had lived with only two of the children for one month at the time of the hearing. We must therefore conclude the children and at least Susan had a significant connection with Indiana and there was substantial evidence concerning the children's present and future care, protection, training and personal relationships available in this state.

■ This is not to say that jurisdiction could not have been properly assumed also in Washington. The facts in this case present a close question.[9] Arguably, the

with the consent of the husband move to state B, which is the wife's former home state and where her parents live. They have been in state B for three months when court proceedings are prepared. Relevant facts about the children's present condition and care are in state B along with some of the facts about the qualifications of one of the potential custodians. State A has the information concerning the past relationship be-

parties' temporary stay in Washington could have satisfied the significant connection test under the Uniform Act. However, custody proceedings were never instituted in Washington and we are not confronted with the problem of competing jurisdiction. Indiana has assumed jurisdiction substantially in conformance with the Uniform Act's provisions and its decree will doubtlessly be accorded binding force in Washington and other states under section 12 of the Uniform Act, if the occasion arises.[10] As suggested in *Bodenheimer, supra* at 1217: "it is less essential to determine with precision *which state* has jurisdiction than to insure that the courts involved cooperate fully in fact-gathering. . . ." (Emphasis in original). The UCCJL provides ample mechanisms for conveying whatever evidence may be available in Washington concerning the family's temporary stay in that state to the Indiana forum. Specifically, IC 31–1–11.6–18 and 19 provide for taking testimony and requesting hearings and studies in other states when such evidence will shed light on the best interests of the child.[11] We therefore find that under the close circumstances of this case, the trial court did

not abuse its discretion in assuming jurisdiction over the custody proceedings.[12]

■ Ronald additionally contends the trial court's exercise of jurisdiction over the custody proceedings violated his due process rights since the court lacked *in personam* jurisdiction. We find a petitioner need not demonstrate minimum contacts under *International Shoe* between the absent parent and the forum in custody proceedings under the UCCJL. Rather, custody is in effect an adjudication of a child's status, which falls under the status exception of *Shaffer v. Heitner*, (1977) 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683. A court may therefore adjudicate custody under the UCCJL without acquiring personal jurisdiction over an absent party given reasonable attempts to furnish notice of the proceedings.

■ In this regard Ronald's partial reliance on *Rinderknecht* is not persuasive. That case recognized both the *in rem* and *in personam* nature of claims traditionally raised in dissolution proceedings. It concluded that although under *Shaffer* the minimum contacts standard of *Internation-*

---

tween each parent and the children as well as most of the facts about the other potential custodian. Here again, it will be difficult to decide which state has more of the relevant evidence."

*Bodenheimer, supra* at 1222–23. Of course, in the instant case, Ronald did *not* remain in Washington, the last matrimonial home.

**10.** Section 12 provides:

"Binding Force and Res Judicata Effect of Custody Decree. A custody decree rendered by a court of this state which had jurisdiction under section 3 of this chapter binds all parties who have been served in this state or notified in accordance with section 5 of this chapter or who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard. As to these parties the custody decree is conclusive as to all issues of law and fact decided and as to the custody determination made unless and until that determination is modified pursuant to law, including the provisions of this chapter."

The UCCJL contains an identical provision at IC 31–1–11.6–12.

**11.** The Indiana provisions are similar to §§ 18 and 19 of the Uniform Act.

**12.** Ronald contends the trial court erred in failing to "make specific findings on the jurisdictional basis for jurisdiction" under the UCCJL, citing *Clark v. Clark*, (1980) Ind.App., 404 N.E.2d 23 for support. Ronald's argument is unclear. No specific findings of fact within the meaning of Ind.Rules of Procedure, Trial Rule 52(A) were requested or required. However, *Clark* does require a *determination* of subject-matter jurisdiction under the UCCJL where a custody dispute has interstate dimensions. *Id.* at 30. The court's order book should affirmatively reflect the court's consideration of the UCCJL by incorporating its conclusion on this issue, although the failure to do so does not automatically result in reversible error. *Id.*

In the instant case, the transcript and record of the proceedings amply demonstrate the trial court's consideration of the UCCJL. The issue was fully briefed and argued before the trial court by both parties. Although the order book does not specifically reflect the court's conclusions in this matter, Ronald's motion to dismiss based on lack of jurisdiction was overruled, a hearing was held regarding custody, and the trial court properly assumed jurisdiction under the UCCJL. The failure to include an order book entry to this effect was not reversible error.

al Shoe applied to both types of actions, "two levels of minimum contact may be found sufficient to meet the requirements of 'Fair play and substantial justice' which are inherent in the minimum contact test." *In re Marriage of Rinderknecht, supra* at 1134. A determination changing the marital status of the parties, consistently viewed as a proceeding *in rem* is supported by minimum contacts where one of the parties is a resident, although the court is unable to obtain *in personam* jurisdiction over the nonresident spouse. On the other hand, mere residency of one spouse is insufficient to meet the minimum contact requirement for exercising *in personam* jurisdiction in adjudicating the "incidences of marriage." *Id.* at 1135. Ronald appears to contend that the issue of child custody falls in the latter category. However, *Rinderknecht* was only concerned with dissolution and property distribution and did not involve a jurisdictional challenge to the custody award. We must therefore return to an examination of *Shaffer* and other authorities to determine the jurisdictional requirements in custody proceedings.

The first significant case dealing with the issue of state court jurisdiction in custody cases was Justice Traynor's opinion in *Sampsell v. Superior Court*, (1948) 32 Cal.2d 763, 197 P.2d 739. *Sampsell* adopted three alternative bases for jurisdiction—the child's domicile, the child's physical presence or personal jurisdiction over both contestants. This multiple jurisdiction test was widely accepted and incorporated into the Restatement (Second) of Conflict of Laws § 79 (1971). Its adoption, however, resulted in conflicting decrees among competing jurisdictions and a rampant "seize-and-run" approach to custody cases (where a parent, perhaps repeatedly, abducts a child and flees beyond a state's borders to avoid jurisdiction).

The problem was further complicated by the United States Supreme Court's decision in *May v. Anderson*, (1953) 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221. In its plurality opinion, the Court held Ohio was not *required* to accord full faith and credit to a custody decision rendered in Wisconsin be-

cause the latter forum failed to acquire personal jurisdiction over the mother, an Ohio resident. The plurality's opinion in *May* has been severely criticized. For example, several distinguished commentators have complained that an interpretation of *May* requiring personal jurisdiction in custody proceedings "would be a catastrophe." Brigitte M. Bodenheimer & Janet Neeley-Kvarme, "Jurisdiction and Child Custody and Adoption after Shaffer and Kulko," 12 U.Cal.D.L.Rev. 229, 243 (1979) (hereinafter cited as *Bodenheimer & Neeley-Kvarme*) *quoting*, H. Clark, the Law of Domestic Relations 610 (1968). Consequently, the plurality opinion in *May* has enjoyed little acceptance. Rather *May* has been interpreted in accord with Justice Frankfurter's concurring opinion which posits the plurality view as *permitting* states to recognize foreign custody decrees rendered without personal jurisdiction over an absent parent under local law but not *requiring* them to do so under the full faith and credit clause. *Id.* at 535–36, 73 S.Ct. at 844–45 (Frankfurter, J., concurring); *Bodenheimer, supra* at 1232.

The Uniform Act was based on this interpretation of *May*. *Bodenheimer, supra* at 1232. *In personam* jurisdiction is not required under the Uniform Act. *E.g., Bodenheimer, supra* at 1231–35; *Bodenheimer & Neeley-Kvarme, supra*; Brigitte M. Bodenheimer, "Interstate Custody: Initial Jurisdiction & Continuing Jurisdiction under the UCCJA," 14 Family L.Q. 203 (1981); Note, "Jurisdiction-Uniform Child Custody Jurisdiction Act," 51 Temple L.Q. 139, 148 (1978). Rather, the Uniform Act adopts the traditional *in rem* approach to custody cases, recognizing the character of such proceedings "is entirely different from child support proceedings and other actions involving monetary or property claims," *Bodenheimer & Neeley-Kvarme, supra* at 233, which are more appropriately characterized as *in personam* actions. *See e.g., Kulko v. Superior Court*, (1978) 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (personal jurisdiction required over absent parent in *support* proceedings). The paramount issue in custody

proceedings is the best interests of the *child*, not the feuding parents. The Uniform Act therefore focuses primarily on the state where the child and family, not a parent alone, maintain significant connections.[13]

The Supreme Court's opinion in *Shaffer* recognized the necessity of such specialized jurisdictional rules in *in rem* status proceedings. After concluding the minimum contact standard of *International Shoe* applied to *in personam* and *in rem* actions alike, the Court cautioned: "We do not suggest that jurisdictional doctrines other than those discussed in text, such as the particularized rules governing adjudications of status, are inconsistent with the standard of fairness." *Shaffer v. Heitner, supra*, 433 U.S. at 208 n.30, 97 S.Ct. at 2582 n.30.[14]

■ The Uniform Act's jurisdictional provisions therefore comport with the mandates of *Shaffer*. Where the petitioner has complied with the notice provisions,[15] the assumption of jurisdiction by a forum meeting the jurisdictional provisions of the Uniform Act satisfies the "traditional notions of fair play and substantial justice" *Shaffer, supra, passim*, embodied in the due process clause. *Rinderknecht* adopted this *in rem* status approach to dissolution proceedings, and we hold the same theory supports a court's assertion of jurisdiction in custody proceedings. Bodenheimer & Neeley-Kvarme, *supra*; "Developments in the Law: The Constitution and the Family," 93 Harv.L.Rev. 1156, 1246–48 (1980); *cf., Goldfarb v. Goldfarb*, (1980) 246 Ga. 24, 268 S.E.2d 648 (parent's continuous residency in forum state provides sufficient nexus to satisfy due process); *In re Appeal in Maricopa County*, (1976) 25 Ariz.App. 333, 543

P.2d 454 (personal jurisdiction over absent parent not required in proceedings for the termination of parental rights). We conclude the trial court's assertion of jurisdiction over the custody proceeding without obtaining *in personam* jurisdiction over Ronald did not violate his due process rights.

*Request for a Stay*

Ronald finally contends the trial court erred in "refusing to consider or grant" a stay of proceedings under Ind. Rules of Procedure, Trial Rule 62(B)(1) pending disposition of the motion to correct errors and further appellate proceedings. He alleges the court ruled a motion for stay was not available in custody matters and therefore the trial court abused its discretion in refusing to even consider a stay. The record does not reflect such a ruling by the trial court, but only contains an entry denying Ronald's motion.

■ Suffice it to say that in child custody proceedings the welfare and best interests of the children are of paramount importance. Any stay of enforcement of a custody order would necessarily consider their best interests. *State ex rel. Winkler v. Superior Court of Marion County*, (1967) 248 Ind. 424, 229 N.E.2d 648. The testimony on this issue was presumably received during the custody hearing, held before Ronald's request for a stay, and was duly considered by the judge in rendering the custody order. It therefore appears another hearing on this issue would have been superfluous, in the absence of any evidence to the contrary. Additionally, Ronald did not challenge the court's decision to award custody of the three children to Susan, but

---

**13.** The Uniform Act and the UCCJL have secured enforcement of custody decrees by sister states, thus avoiding the full faith and credit problem, by incorporating § 12 according foreign decrees binding force. See § 12 quoted in footnote 10, *supra*.

**14.** Furthermore, the Supreme Court has apparently recognized the unique nature of similar proceedings and the concommitant necessity for specialized jurisdictional rules in *Stanley v. Illinois*, (1972) 405 U.S. 645, 92 S.Ct. 1208, 31

L.Ed.2d 551 where notice by publication was held sufficient to terminate the rights of an unwed father when personal service could not be obtained. In fact, at least one commentator has suggested *Stanley v. Illinois* overruled *May* "sub silentio." H. Clark, Cases and Problems on Domestic Relations 673 (2d ed. 1974).

**15.** Uniform Act, §§ 4, 5 and IC 31–1–11.6–4 and 5. In his brief, Ronald does not challenge service of process.

only challenged the court's jurisdiction. We must defer to the trial court's determinations involving the best interests of the children. The trial court's denial of Ronald's motion for a stay of enforcement of the custody order is affirmed. This Court previously denied Ronald's motion for a stay pursuant to Ind. Rules of Procedure, Trial Rule 62(D)(1); we affirm that ruling.

That portion of the trial court's order distributing the marital property is reversed. The judgment is affirmed in all other respects.

CONOVER and YOUNG, JJ., concur.