# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 20 2021, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan D. Harwell
Harwell Legal Counsel LLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Karen A. Wyle
Bloomington, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Paternity of Sophia C. Spinks: | January 20, 2021 |
| Courtney Spinks, | Court of Appeals Case No. 20A-JP-1423 |
| *Appellant-Respondent,* | Appeal from the Monroe Circuit Court |
| v. | The Honorable Stephen R. Galvin, Judge The Honorable Bret Raper, Commissioner |
| David Matthew Roach, | |
| *Appellee-Petitioner.* | Trial Court Cause No. 53C07-1609-JP-589 |

**Kirsch, Judge.**

[1] Courtney Spinks ("Mother") appeals the trial court's order that granted David Matthew Roach's ("Father") petition to modify custody of their child, Sophia

C. Spinks ("Child") from joint physical and legal custody to legal and primary physical custody of Child to Father. Mother raises two issues on appeal, which we restate as:

> I. Whether the trial court abused its discretion in denying Mother's second motion for continuance where she lacked the financial means to hire an attorney at the time; and

> II. Whether the trial court abused its discretion in modifying the custody of Child to Father where there was no substantial change in circumstances.

We affirm.

## Facts and Procedural History

Mother and Father met in 2009, and on April 25, 2010, Child was born to Mother and Father. *Appellant's Conf. App. Vol. 2* at 97. Mother and Father never married. *Id*. After Child was born, Mother and Father lived together in Muncie, Indiana. *Id*. In Spring of 2012, Mother, Father, and Child moved to Bloomington, Indiana. *Id*. Mother and Father separated during the summer of 2016 and were co-parenting without a court order. *Id*. at 98. At some point during 2016, Father began dating Kelley Wolfe ("Kelley"). Father and Kelley are now engaged. *Id*. at 107. Their relationship is stable and happy. *Id*.

On September 6, 2016, Father filed a verified petition to establish paternity, and his paternity was established. *Appellant's App. Vol. 2* at 5. On October 5, 2016, Mother and Father entered a mediated agreed entry in which they agreed to

share legal and physical custody of Child. *Id*. at 6, 22-27. In April 2017, they entered into a second agreement, under which they continued to share physical and legal custody, which the trial court approved on June 8, 2017. *Id*. at 29-33. Under this agreed order, Child generally spent half her time with each parent, moving from one to the other every three days or less. *Tr. Vol. V*. at 49; *Appellant's Conf. App. Vol. 2* at 100.

[5] At some point after the June 8, 2017 order was entered, communication between Mother and Father became acrimonious, so the guardian ad litem ("GAL") and the trial court agreed that Mother and Father should use Our Family Wizard, a communication tool that would moderate the tone of their exchanges. *Tr. Vol. IV* at 13-14, 131. Mother took significantly longer than Father to begin using this tool, and she has not used it consistently. *Tr. Vol. V* at 20, 68-69, 88, 129-30, 157. Whenever possible, Father communicated to Mother through Our Family Wizard. *Id*. at 87-88.

[6] On several occasions, Mother asked Child to request that Father allow Child to spend extra time with her. *Tr. Vol. IV* at 98; *Appellant's Conf. App. Vol. 2* at 106. When Child stayed with Mother, Child had a hard time disclosing her thoughts and feelings to Mother if doing so would hurt Mother's feelings. *Tr. Vol. V* at 137; *Appellant's Conf. App. Vol. 2* at 110. Child did not want to hurt either parent's feelings. *Tr. Vol. IV* at 27; *Appellant's Conf. App. Vol. 2* at 133. For example, Child was afraid to tell Mother that she liked Kelley because of Mother's intense dislike of Kelley. *Appellant's Conf. App. Vol. 2* at 101.

[7]     In July 2017, Mother instigated an argument about the clothes Child was wearing when Mother came to pick Child up at Father's home. *Id*. at 100-01. Mother was so angry that she started to drive away with Child standing inside the car while the car door was still open. *Id*. at 101. Mother admitted to an Indiana Department of Child Services ("DCS") case worker that she "just couldn't control herself." *Tr. Vol. IV* at 36; *Appellant's Conf. App. Vol. 2* at 100-01. DCS investigated the incident but did not substantiate that there was abuse or neglect. *Appellant's Conf. App. Vol. 2* at 101.

[8]     Mother had, on several occasions, planned to relocate herself and Child to be near one or another of Mother's boyfriends. *Id*. at 143. Moreover, she had spoken to Child about these impending relocations before revealing her intentions to Father or determining how such relocations would affect Child's education, the custody arrangement, or Father's parenting time. *Tr. Vol. V* at 121-23; *Appellant's Conf. App. Vol. 2* at 106. The GAL expressed concern that Mother's repeatedly introducing Child to her boyfriends and allowing Child to become attached to these men could lead to psychological difficulties for Child when those relationships ended. *Tr. Vol. IV* at 12, 18-19, 22. Mother made such introductions despite admitting, in a colorful Facebook posting, that she had a history of dating unreliable and unpleasant men, including a recent boyfriend who stole her car:

> What kind of special A-Hole steals your car?!?! . . . .
>
> Somehow I have the UNCANNY ability to find every fkface
> there is in this state and date them. Like a damn moth to a

flame. Not sure why that is. So, girls, if you have ANY sort of interest in a guy NONE of us should date him. If, however, I don't have an interest, he's probably pretty sweet and has plenty going for him. Guys that I've rejected [should] take that as a compliment. I could probably get a job as an a\*\*hole detector for this talent of mine. Think of the millions I'd make! Anyone who knows me well enough should know this. ANNNYWAYS . . . [j]ust wanted you to throw that out there for any of you who know the most recent sh\*\*bag . . . .

*Appellant's Conf. App. Vol. 2* at 112.

[9] The GAL characterized Mother as emotional, sometimes volatile, and lacking in insight, seldom recognizing -- unlike Father -- when she has made a mistake and tending to interpret people's actions -- especially Father's -- in a distorted manner. *Id*. at 106-07. Mother painted a "very dark picture" of Father. *Id*. at 101. Mother would also build up minor issues into major injustices, unable to see such issues from the perspective of other people. *Id*. at 106. The GAL recommended that Mother get counseling from a mental health professional. *Id*. at 116. The GAL also reported that mother showed poor judgment in her conversations with Child; for instance, Mother would ask Child to ask Father if she could spend more time with Mother instead of Mother herself asking Father if Child could spend more time with her. *Id*. at 147. The GAL recommended that Father have primary custody of Child. *Id*. at 115.

[10] Child began third grade in the fall of 2018, and her teacher was Ms. Jennifer Fox ("Ms. Fox"); Child began fourth grade in the fall of 2019 with her primary teacher being Mrs. Meghann Goetz ("Mrs. Goetz"). *Id*. at 101, 116, 146. Ms.

Fox and Mrs. Goetz testified that Father had been consistently reliable and proactive in getting to know Child's teachers, communicating with them, scheduling and attending parent-teacher conferences, and working with Child on her homework. *Tr. Vol. IV* at 64-65, 71-72, 88. Father promptly signed up to use ClassDojo, software enabling him to monitor Child's progress and communicate with her teachers. *Id*. at 73; *Tr. Vol. V* at 158. Child's reading performance improved after her third-grade teacher met with Father and enlisted his aid to help Child improve her reading. *Tr. Vol. IV* at 65. By contrast, Child's teachers and a school social worker noticed that Child was less awake and involved in her schoolwork after spending nights with Mother. *Id*. at 63-64; *Tr. Vol. V* at 160-61. Moreover, Mother failed to use the Dojo system, and ignored several reminders to sign up for parent-teacher conferences until the day those conferences were set to begin, by which time all time slots had been filled. *Tr. Vol. IV* at 66; *Appellant's Conf. App. Vol. 2* at 104.

[11] On July 16, 2019, Father filed a verified petition to modify custody. *Appellant's App. Vol. 2* at 13, 45-47. On August 12, 2019, the trial court scheduled a hearing on Father's petition to modify custody for October 21, 2019. *Appellant's App. Vol. 2* at 13-14. On October 18, 2019, Mother sent the trial court a letter, which the trial court treated as a motion to continue the hearing on Father's petition to modify custody. *Id*. at 14. The trial court granted Mother's request and set the hearing for February 3, 2020. *Id*.

[12] On December 3, 2019, the trial court held a hearing on Mother's failure to comply with the trial court's order that directed Mother to respond to Father's

requests for discovery. *Tr. Vol. III* at 4. Mother said she wanted an attorney but could not yet afford one. *Id*. at 7, 11. The trial court "absolutely encourage[d]" Mother to get an attorney, told her that it had information about free legal resources, and promised to provide Mother that information. *Id*. at 11, 13.

[13] On January 28, 2020, Mother filed a second request for continuance via a letter she wrote to the trial court, asking for another thirty days "so that [she] may engage in representation." *Appellant's App. Vol. 2* at 119. Father objected to the request for a second continuance, emphasizing that it would not be in Child's best interest and that he had already arranged for witnesses to attend the hearing, including a teacher who had already adjusted her schedule once before, for the previously continued hearing. *Id*. at 120-22. On January 30, 2020, the trial court denied Mother's request for a second continuance. *Id*. at 18.

[14] Mother orally renewed her motion for continuance at the start of the February 3, 2020 hearing. *Tr. Vol. IV* at 6, 8. She stated that she "[did] now have an attorney" but had not yet paid his full retainer, which she expected to pay by the end of that week. *Id*. at 6-7. The trial court denied Mother's oral renewed motion, stating:

> [T]his has been on the books for quite some time and, and it, um, this Court's experience is it puts young children, children, um, in a, in a situation where they feel like, um, there's just, there's no resolution and then they're trying to appease both parents and the child needs resolution and so, I'm going to deny the request

to continue the matter given that it's been on the books for quite some time.

*Id*. at 8-9.

Father began his case in chief at the February 3, 2020 hearing. *Tr. Vol. IV* at 10. The following people testified on behalf of Father: the GAL, Ms. Fox, and Father himself. *Id*. at 11-18, 56-60, 62-68, 74-76, 76-121. Mother cross-examined the GAL and Ms. Fox. *Id*. at 18-55, 68-73. Because the time was insufficient to complete the hearing, Father did not complete his direct testimony. *Id*. at 128. The trial court scheduled a second day for the hearing for June 12, 2020. *Id*. at 133-34. At the June 12, 2020 hearing, Mother was represented by counsel. *Tr. Vol. V* at 3. At that hearing, Father completed his direct testimony, and Mother's counsel cross-examined Father. *Id*. at 13-48, 48-77, 77-92, 92-96.

The hearing was completed on June 12, 2020. *Tr. Vol. VI* at 19. On July 1, 2020, the trial court issued its final ruling, which, in pertinent parts, found and concluded as follows:

**Findings of Fact**

1. [Mother and Father], who have never been married to each other, share [Child] . . ., who is presently ten (10) years of age. [Child] recently completed her fourth (4th) grade year at Arlington Heights Elementary School.

. . . .

6. In accordance with [the] [June 8,] 2017 Order, [Mother and Father] share joint physical and legal custody of [Child]. . . .

. . . .

26. On or about July 7, 2017, less than one (1) month after the issuance of the [June 8,] 2017 Order, the Indiana Department of Child Services (DCS) initiated an investigation following an argument between [Mother and Father] during a parenting time exchange.

27. Mother had arrived at Father's home to pick up [Child] and . . . Mother was dissatisfied with Child's attire. Mother made Child go back inside Father's home to change clothes. An argument ensued between Father and Mother which resulted in [Mother and Father] yelling at each other in the presence and/or hearing of [Child]. Mother then began to drive off with [Child] in the car; however, [Child's] car door was not fully secured[,] and it opened as Mother was driving off. Fortunately, [Child] did not fall out of the car nor was [Child] otherwise physically injured. After this incident the parties began effecting parenting exchanges at a neutral location.

28. DCS did not substantiate abuse or neglect against Mother, although the DCS case manager did recommend therapy for [Child], and she further suggested both parents might benefit from individualized therapy.

. . . .

40. Ms. Fox was aware of the parents' shared custody arrangement, and she observed differences with respect to the quality of [Child's] school performance depending on which parent kept [Child] the previous night.

41. Ms. Fox found Father to be more engaged in [Child's] academic progress than Mother was. . . .

42. Ms. Fox observed that [Child] would always do homework when she was under Father's care. Ms. Fox acknowledged that towards the end of the school year [Child] was doing better at completing homework while under Mother's care.

43. Ms. Fox developed concerns that [Child] was experiencing tension with Mother during the 2018 fall semester to the extent that Ms. Fox ultimately felt compelled to share her concerns with the school social worker.

44. [Child] successfully completed the third (3rd) grade (2018-2019), and she enrolled in the fourth (4th) grade at Arlington Heights Elementary School in August 2019. Mrs. Goetz was [Child's] fourth (4th) grade teacher.

45. The GAL spoke with Mrs. Goetz who indicated that [Child] has trouble focusing, and that her school performance is inconsistent. . . . Mrs. Goetz expressed concern to the GAL that [Child] does not work to her potential.

46. Mrs. Goetz advised the GAL that she . . . sometimes had to sit with [Child] to do math, and that [Child] received some extra help with reading. . . . .

47. Mrs. Goetz advised the GAL that Father communicates well with her. Mrs. Goetz noted that Father attended Open House, Meet the Teacher, and a parent-teacher conference. Mrs. Goetz described Father as being "proactive" when [Child] had a problem.

48. Mrs. Goetz advised the GAL that as of December 13, 2019, she had met with Mother on only one (1) occasion, and that was when [Child] had a toy taken away at school and a parent was required to come to school . . . to reclaim it.

49. At the beginning of the 2019-2020 school year, Mrs. Goetz sent both parents an invitation to ClassDojo, which is an educational communications computer application. Father immediately signed up for ClassDojo whereas Mother did not.

. . . .

53. The GAL describes Father as being detail-oriented and responsible. The GAL further notes that Father assists [Child] with her homework and that he sets appropriate boundaries for her.

. . . .

58. The GAL expressed concern that Mother involves [Child] in "adult conversations," noting, by way of example, that Mother sometimes encourages [Child] to call Father to ask for extra time with Mother rather than Mother contacting Father herself.

. . . .

60. The GAL describes Mother as "emotional" and "at times volatile." The GAL states that Mother "seems to lack insight," and that Mother "seldom recognizes when she has made a mistake."

61. The GAL found there to be a high level of animosity between [Mother and Father], and that [Child] is highly aware of this animosity and she feels caught in the middle. The GAL

believes this ongoing conflict is emotionally harmful to [Child] as she does not wish to hurt either parent's feelings.

62. The GAL opines that continuing the existing co-parenting relationship would be detrimental to [Child], and that [Child] needs stability and decreased parental strife. . . .

. . . .

64. Mother recently purchased a smart phone for [Child] without any consultation and/or consent from Father. During cross-examination Mother first denied that [Child's] phone was internet accessible, but she later acknowledged that it was, but that she carefully monitored [Child's] cell phone usage. Mother further acknowledged that [Child's] cell phone is password protected, and she has not shared the password with Father as [Child] needs privacy.

**Conclusions of Law**

. . . .

8. [T]he court finds Father's testimony to be more credible than Mother's. The court found Father's testimony to generally be plausible in that it was logically consistent and empirically supported.

9. In many instances the court found Mother's testimony not plausible. Mother's credibility was diminished in her responses to various cross-examination questions posed by Father's counsel . . . .

. . . .

16. [I]t is clear that both parents, who presently share joint physical custody of the [Child] have "buyer's remorse" regarding their negotiated agreement which resulted in the [June 8,] 2017 Order. During the course of the hearing both Father and Mother stated . . . their belief that [Child] would be best served by him/her serving as [Child's] primary physical custodial parent.

17. Since the [June 8,] 2017 Order the level of distrust and animosity between [Mother and Father] has drastically increased, and this is especially true after Father began his relationship with Kelley. The GAL believes that [Child] is highly aware of the co-parenting tension and she feels stuck in the middle.

18. There is significant evidence to suggest that since the [June 8,] 2017 Order Mother has discussed with [Child] her animosity and distrust of Father, as well as her . . . disdain for Kelley, such that [Child] is afraid to express to Mother that she . . . actually likes Kelley.

19. The GAL indicates that [Child] feels the conflict between [Mother and Father] and that she . . . does not wish to hurt anyone's feelings. The GAL surmises that [Child] is feeling pressure from Mother to tailor her statements regarding Father, and that [Child] is experiencing mental distress between being loyal to Mother and telling the truth.

20. The GAL concludes, and the court agrees, that [Child] should be able to express herself to each parent without having to censor herself. [Child] desires to be truthful and [Child] should not be pressured to say things she does not believe to be true. Mother's conduct in this regard has proven to be harmful to [Child's] emotional wellbeing.

21. A second significant change in circumstances relates to [Child's] academic progress. Since the [June 8,] 2017 Order

[Child] has advanced three (3) grades, and while [Child's] age and educational grade advancement alone do not establish a substantial change for custody modification, it is clear in this case that since the [June 8,] 2017 Order Father has emerged as the parent who is attentive to and responsible for [Child's] educational achievement and progress.

22. Father regularly attends school meetings and functions; he routinely communicates with [Child's] teachers; and he consistently monitors and assists [Child] with homework assignments.

. . . .

24. [Child's] fourth grade teacher, Ms. Goetz, indicated to the GAL that [Child] has difficulty focusing and that she has needed additional assistance. Ms. Goetz praised Father for being proactive and communicative regarding [Child's] schoolwork, whereas Mother was less involved and communications with Mother were limited.

25. While the aforementioned changes serve as the primary basis for custody modification, the body of evidence also corroborates the GAL's concerns regarding Mother's overall inconsistency in keeping [Child's] appointments, including parenting exchanges, as well as what the GAL characterizes as Mother's impulsivity.

26. The court ultimately concludes that Father has met his burden of demonstrating that the existing custody order is no longer feasible and that [Child's] best interest is served by Father serving as the primary physical custodial parent.

. . . .

30. [Mother and Father] have not demonstrated a willingness and/or ability to communicate and cooperate in advancing [Child's] welfare, and their unwillingness to communicate has intensified since the [June 8,] 2017 Order.

31. [Mother and Father's] recently elevated distrust and animosity toward each other is regrettable as both parents dearly love [Child], and [Child] could benefit from their collaborative decision making. However, at this time, only Father has routinely demonstrated the requisite fitness and suitability necessary for legal custody.

. . . .

**IT IS THEREFORE ORDERED, ADJUDGED, and DECREED:**

1. **Physical Custody.** In accordance with I.C. § 31-14-13-6 and I.C. § 31-14-13-2 the court finds that the existing physical custody order should be modified and that Father should be awarded primary physical custody of [Child], subject to Mother's parenting time . . . .

2. **Legal Custody.** Father shall be awarded sole legal custody of [Child]. Father shall keep Mother timely apprised as to all major issues and decisions regarding [Child], and he shall timely advise Mother as to [Child's] medical appointments, including all dental and psychological appointments.

*Appellant's App. Vol. 2* at 142, 144, 146-54. Mother now appeals.

# Discussion and Decision

## I. Denial of Motion for Continuance

Mother contends that the trial court abused its discretion when it denied her renewed motion for a second continuance at the beginning of the February 3, 2020 hearing. Indiana Trial Rule 53.5 provides in part: "Upon motion, trial may be postponed or continued in the discretion of the court[] and shall be allowed upon a showing of good cause established by affidavit or other evidence." *Id.* The ruling on a motion for continuance is left to the discretion of the trial court, a trial court's denial of a motion for continuance is entitled to substantial deference, and we presume that a trial court properly exercised its discretion. *Blackburn v. State*, 130 N.E.3d 1207, 1210 (Ind. Ct. App. 2019). This principle holds true in custody cases. *See, e.g., Clark v. Clark*, 404 N.E.2d 23, 26-27, 36 (Ind. Ct. App. 1980). When a motion for continuance is based on a party's effort to obtain counsel, that party must show diligence in procuring counsel. *Gunashekar v. Grose*, 915 N.E.2d 953, 955 (Ind. 2009); *Riggin v. Rea Riggin & Sons, Inc.*, 738 N.E.2d 292, 311 (Ind. Ct. App. 2000). For purposes of representation by counsel, a custody hearing is a critical stage of a custody modification proceeding. *F.M. v. N.B.*, 979 N.E.2d 1036, 1042 (Ind. Ct. App. 2012). We measure the prejudice to the respective parties of a trial court's ruling on a motion for continuance. *Id.*

Mother contends the trial court abused its discretion in denying her motion for continuance because: 1) she needed more time to acquire funds to hire an attorney and that she was diligent in trying to hire an attorney, evinced by her

willingness to take a second job to help pay for an attorney; 2) she was prejudiced by the denial of her motion for continuance; and 3) Father's petition for change of custody had been pending for only six months, making a delay in the pending custody matter insignificant. In support of her claim that a continuance was justified to give her more time to hire an attorney, Mother cites *F.M.*, 979 N.E.2d at 1041, *Hess v. Hess*, 679 N.E.2d 153, 154 (Ind. Ct. App. 1997), and *J.P. v. G.M.*, 14 N.E.3d 786, 791 (Ind. Ct. App. 2014).

[19] In *F.M.*, we found that the trial court abused its discretion in denying a mother's first request for a continuance. 979 N.E.2d at 1041. The mother had filed her first motion for continuance on the first day of the custody modification hearing because her attorney had unexpectedly withdrawn earlier that day because she had failed to pay him. *Id*. at 1038. We found that granting the mother's request for a continuance would not have prejudiced the father. *Id*. *F.M.* did not address whether the delay in resolving the custody issue caused by a continuance would negatively impact the child.

[20] In *Hess*, a dissolution case, the husband's attorney unexpectedly withdrew four days before the final dissolution hearing. 679 N.E.2d at 154. Two days before the final hearing, the husband, pro se, filed his first motion for a continuance, and at the beginning of the final hearing, the trial court denied the husband's motion. *Id*. In finding that the trial court abused its discretion in denying the husband's motion, we stated: "There is nothing in the record to show that Husband intended or could foresee that counsel would withdraw at such a late hour." *Id*. at 155.

[21] Finally, in *J.P.*, grandparents filed a petition to visit the father's child. 14 N.E.3d at 786. The day before the hearing was to begin, the father learned for the first time that the grandparents would be represented by counsel at the hearing. *Id*. at 788. Because he did not have time to hire an attorney, the father appeared pro se at the hearing and asked the trial court to continue the hearing so he could hire counsel. *Id*. at 788-89. Until father learned that the grandparents had hired an attorney, he had believed that involvement of attorneys was unnecessary: "I thought we were all just going to do it without an attorney, so I didn't get one." *Id*. at 788. The trial court denied the father's request for a continuance. *Id*. at 788-89. During the hearing on the grandparents' petition for visitation, the father asked no questions and presented almost no substantive testimony, explaining that he wanted a lawyer to assist him because he did not completely understand the proceedings. *Id*. at 789. We ruled that the trial court should have granted the motion for continuance because the father was prejudiced by participating in the hearing without an attorney, which thus deprived him of his fundamental right in the care, custody, and control of his child. *Id*. at 790-91 (citing *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

[22] Here, we find that the trial court did not abuse its discretion in denying Mother's motion for a continuance. We acknowledge Mother's testimony that she needed more time to acquire funds to hire an attorney -- and had taken a second job to help her afford an attorney -- but the trial court could have found this explanation was inadequate because weeks earlier the trial court advised

Mother about the availability of free legal services. *Tr. Vol. III* at 11, 13. Further, when Mother filed her second motion for continuance and renewed her motion at the beginning of the hearing, she provided no evidence that she had even attempted to acquire pro bono counsel. *See Tr. Vol. IV* at 8; *Appellant's App. Vol. 2* at 119.

[23] We also reject Mother's argument that she was prejudiced by the denial of her motion for continuance. Mother does not explain how she was prejudiced. For instance, she does not contend that had she been given more time to hire a lawyer for the final hearing, a lawyer present at the first day of the hearing would have elicited testimony on cross-examination that would have helped Mother's position. Instead, she leaves us to speculate as to how she was prejudiced by the denial of her motion for continuance and the lack of counsel at the first day of the hearing on Father's petition to modify custody. Therefore, because Mother has not explained how she was prejudiced, she has waived this claim for lack of cogent argument. *See Jarman v. State*, 114 N.E.3d 911, 915 n.2 (Ind. Ct. App. 2018), *trans. denied*.

[24] Waiver aside, Mother was not prejudiced by the denial of her motion for continuance. We first observe that unlike the parties in *F.M.*, *Hess*, and *J.P.*, Mother had earlier obtained a continuance, so the continuance request at issue in this appeal was a request for a second continuance. *Appellant's App. Vol. 2* at 14. More importantly, the parties in *F.M.* and *Hess* were substantially prejudiced by the eleventh-hour withdrawals of their attorneys. *F.M.*, 979 N.E.2d 1038; *Hess*, 679 N.E.2d at 154. And the father in *J.P.* was caught off

guard when he learned just one day before the hearing on the petition for grandparent visitation that the opposing party was represented by counsel because he had believed that "we were all just going to do it without an attorney, so I didn't get one." 14 N.E.3d at 788. Here, Mother's second request for a continuance did not arise from being blindsided by the actions of an attorney she had already hired or by being taken off guard by the actions of the opposing party.

[25] Moreover, even though Mother was not represented on the first day of the hearing, she was still not prejudiced. The final hearing occurred over two days, February 3, 2020, and again more than four months later on June 12, 2020. *Appellant's App. Vol. 2* at 18, 20. Father began his case in chief at the February 3, 2020 hearing and during that hearing, time allowed him to call only three witnesses, the GAL, Ms. Fox, and himself. *Tr. Vol. IV* at 11, 56, 62, 74, 76. Mother cross-examined the GAL and Ms. Fox. *Id*. at 18-55, 68-73.

[26] Thus, unlike the father in *J.P.*, Mother participated in the first day of the hearing in a significant, meaningful manner. *See J.P.*, 14 N.E.3d at 789. Also, while Father began his testimony during the first day of the hearing, he did not complete his direct testimony before the trial court adjourned the matter for the day. *Tr. Vol. IV* at 128. On the second day of the hearing, June 12, 2020, Father continued with his direct testimony, and at this second day of the hearing, Mother was represented by counsel. *Tr. Vol. V* at 3. Once Father completed his testimony, Mother's counsel thoroughly cross-examined Father. *Tr. Vol. V* at 48-77, 92-94. Father called two more witnesses, including the

GAL, who had testified at the first day of the hearing. *Id.* at 96-105, 112-14, 153-62. Mother's counsel also thoroughly cross-examined the GAL. *Id.* at 115-153, 162-65. Mother then presented her case-in-chief though her attorney. *Id.* at 168-77, 182-89, 192-228; *Tr. Vol. VI* at 6-11. In sum, Mother's attorney was able to put on Mother's case-in-chief and was able to cross-examine all of Father's witnesses except Ms. Fox, whom Mother had cross-examined during the first day of the hearing. *Tr. Vol. IV* at 18-55, 68-73. Thus, Mother has failed to demonstrate that she was prejudiced by the denial of her second motion for continuance.

[27] Finally, we reject Mother's claim that the trial court abused its discretion in denying her motion for continuance because, according to Mother, continuing the hearing was not problematic because Father's petition to modify custody had been pending only six months. Mother ignores the impact of a continuance on Child. As the trial court found:

> [T]his has been on the books for quite some time and, and it, um, this Court's experience is it puts young children, children, um, in a, in a situation where they feel like, um, there's just, there's no resolution and then they're trying to appease both parents and the child needs resolution and so, I'm going to deny the request to continue the matter given that it's been on the books for quite some time.

*Id.* at 8-9. The trial court was in the best position to weigh the impact of a continuance on Child, so we will not second guess the trial court's determination that a continuance was not in Child's best interest. Accordingly,

for all the foregoing reasons, we conclude that the trial court did not abuse its discretion when it denied Mother's request for a second continuance.

## II.  Modification of Child Custody

[28]  Mother contends that the trial court abused its discretion when it modified the original custody order and granted Father primary physical and sole legal custody of Child.  We review custody modifications for an abuse of discretion. *Werner v. Werner*, 946 N.E.2d 1233, 1244 (Ind. Ct. App. 2011), *trans. denied*.  We grant significant latitude to trial judges in family law matters.  *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016).  Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence."  *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002).  Thus, we will not "reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment."  *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011).  We will reverse the trial court's custody determination only if the decision is "clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom."  *In re Paternity of C.S.*, 964 N.E.2d 879, 883 (Ind. Ct. App. 2012), *trans. denied*.  "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal."  *Kirk*, 770 N.E.2d at 307.

[29]     Indiana Code section 31-17-2-21 provides that a trial court may not modify an existing custody order unless (1) the modification is in the best interests of the child, and (2) there has been a substantial change in one or more statutory factors outlined in Indiana Code section 31-17-2-8. Indiana Code section 31-17-2-8 provides, in part:

> The court shall determine custody and enter a custody order in accordance with the best interests of the child. . . . The court shall consider all relevant factors, including the following:
>
> . . . .
>
> (4) The interaction and interrelationship of the child with:
>
> (A) the child's parent or parents;
>
> . . . .
>
> (5) The child's adjustment to the child's:
>
> . . . .
>
> (B) school . . .
>
> (6) The mental and physical health of all individuals involved.

Ind. Code § 31-17-2-8. "[T]he child's best interest is the touchstone of any custody determination . . . ." *McDaniel v. McDaniel*, 150 N.E.3d 282, 291 (Ind. Ct. App. 2020), *trans. denied*.

[30]     Here, it appears that neither party requested special findings under Indiana Trial Rule 52(A) and that the trial court entered its findings sua sponte. "As to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). When a party fails to challenge the evidentiary basis of a finding, we accept that finding as true. *See McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when father failed to challenge specific findings, court accepted them as true). Findings will only be set aside if they are clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no evidence to support the findings, whether directly or by inference. *Id.* A judgment is clearly erroneous also if it applies the wrong legal standard to properly found facts. *Id.* In order to determine that a finding or conclusion is clearly erroneous, our review must convince us that a mistake has been made. *Id.* As to issues not addressed in a trial court's sua sponte findings, we review those issues under the general judgment standard, where we will affirm the judgment if it can be sustained on any legal theory consistent with the evidence. *Id.* "[W]e may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court." *Stone v. Stone*, 991 N.E.2d 992, 998 (Ind. Ct. App. 2013).

[31]     Mother contends Father presented no evidence of a substantial change in circumstances to justify the trial court's decision to grant Father's petition to modify custody. Specifically, Mother claims, inter alia, that there is no

evidence of substantial change of circumstances regarding: 1) her and Father's ability to co-parent Child; 2) Child's academic performance and Father's involvement in Child's education; and 3) her impulsive behavior.

[32] Mother's first argument that there is no evidence of changed circumstances regarding her and Father's ability to co-parent Child implicates Indiana Code section 31-17-2-8(4))(A), which states that when a trial court makes a custody decision, it should consider the "interaction and interrelationship of the child with: (A) the child's parent or parents . . . ." We have previously held that the breakdown in communication between parents justified a change of custody. *See In re Marriage of Cain*, 540 N.E.2d 77, 78 (Ind. Ct. App. 1989) ("The evidence supported the trial court's conclusion that the parties were unable or unwilling to share authority for the major decisions concerning the child's upbringing[, and] [t]he breakdown in communication and cooperation between the joint custodians was a substantial and continuing change in circumstances making the joint custody order unreasonable."); *cf. Williamson v. Williamson*, 825 N.E.2d 33, 41 (Ind. Ct. App. 2005) (Upon former wife's motion for modification of custody of minor child, the quality of relationship between child and former wife's new husband was factor to be considered in determining that substantial change warranted award of sole custody of subject child to former wife).

[33] Mother's argument focuses on the trial court's findings regarding the growing tension between Father and Mother, especially since Father began his relationship with his Kelley. The trial court found that Child was aware of this

escalating tenson and felt "stuck in the middle." *Appellant's App. Vol. 2* at 151. It also found that Mother expressed to Child her disdain of Father and Kelley, which made Child feel she could not tell Mother that she liked Kelley and pressured Child to tailor all her statements to Mother in a way that would not hurt Mother's feelings. *Id*. The trial court found that this pressure was harming Child's emotional wellbeing. *Id*.

[34] Mother does not challenge the evidentiary basis of these findings but instead asks us to assign less weight to them than did the trial court, a request we must decline because our standard of review does not allow us to reweigh the evidence. *See Best*, 941 N.E.2d at 502. Furthermore, Mother ignores other trial court findings regarding how the growing tension between Mother and Father made co-parenting more difficult and harmed Child. For instance, the trial court found that the existing co-parenting relationship would emotionally harm Child and that Child needed stability and less parental strife. *Appellant's App. Vol. 2* at 147. Because Mother does not challenge these findings, we accept them as true. *See McMaster*, 681 N.E.2d at 747. Therefore, the trial court could have concluded that under Indiana Code section 31-17-2-8(4)(A), Child's relationship with Mother under the prior custody order was undermining her relationship with both Mother and Father, was forcing Child to choose between telling the truth about her feelings about Kelley and risk Mother's ire or hide the truth and censor her feelings for no other reason than to placate Mother's feelings, was making communication between Mother and Father more difficult, and thus was making co-parenting more difficult. Accordingly, the

trial court did not abuse its discretion in finding that the parties' difficulty in communicating because of their increasing hostility was undermining Child's relationship with both Mother and Father and was making co-parenting more difficult, such that it was in Child's best interest to grant Father's petition to modify custody.

[35] Second, we reject Mother's argument that the evidence regarding Father's role in Child's education did not constitute a substantial change in circumstances justifying a change in custody. Indiana Code section 31-17-2-8(5)(B) provides that one factor in determining whether to modify child custody is "[t]he child's adjustment to the child's . . . school." We have held that stability in education is a factor a trial court may consider when reviewing a petition to modify custody. *See Kuiper v. Anderson*, 634 N.E.2d 556, 558 (Ind. Ct. App. 1994). Mother argues that the only evidence that Father helps Child with homework more than Mother came from six reading logs that Father submitted into evidence. As to her failure to communicate with teachers, attend school meetings and functions, Mother blames Father for not telling her the dates and times for the school meetings. She also blames Father for her failure to utilize the ClassDojo communication tool, claiming he should have told her about ClassDojo, but he failed to do so. Mother justifies her failure to attend parent-teacher conferences because all time slots for the teacher-parent meetings had been taken. On this allegation, Mother fails to acknowledge that she did not attempt to schedule a meeting until the day that those teacher-parent meetings were to occur. *Tr. Vol. IV* at 66. In all of these allegations, Mother does not

contend that there was no evidence to support these facts but instead asks us to minimize the significance of this evidence. This is an impermissible request to reweigh the evidence. *See Best*, 941 N.E.2d at 502.

[36] Moreover, Mother ignores other evidence the trial court recited to justify its conclusion that Father played a more positive role in Child's education than Mother did. The trial court's findings included: 1) Ms. Fox determined Father was more engaged in Child's education, based partly on her observation that Child's school performance was better if she had spent the previous night with Father and that Child's homework was always completed when Child has spent the previous night with Father; 2) Mrs. Goetz stated that Father was proactive and frequently communicated with her, met with her several times while she had met Mother only once; and signed up immediately to use the ClassDojo tool while Mother had not. *Appellant's App. Vol. 2* at 146-47, 151-52. Thus, in light of the foregoing findings and conclusions, most of which Mother does not challenge, we conclude the trial court did not abuse its discretion in finding a substantial change in circumstances regarding Child's education and that granting Father's petition to modify custody was in Child's best interests for her education. *See* Ind. Code § 31-17-2-8(5)(B).

[37] Third, we reject Mother's argument that evidence of her emotionally unstable, impulsive behavior did not constitute a substantial change in circumstances justifying a change in custody. Even though Indiana Code section 31-17-2-8 does not explicitly list this as a factor in determining custody, we find this issue still falls under this statute because the statute instructs trial courts to consider

"all relevant factors," which includes "(6) The mental and physical health of all individuals involved." "[I]f one parent can demonstrate that the other has committed misconduct so egregious that it places a child's mental and physical welfare at stake, a custody order may be modified." *Albright v. Bogue*, 736 N.E.2d 782, 790 (Ind. Ct. App. 2000); *see also Hanson v. Spolnik*, 685 N.E.2d 71, 78 (Ind. Ct. App. 1997), *trans. denied*. In *Doubiago v. McClarney*, 659 N.E.2d 1086, 1088 (Ind. Ct. App. 1995), *trans. denied,* we affirmed the trial court's decision to modify custody by giving father sole legal custody of the child because of Mother's emotional instability, her suspicious nature, her tendency to blame others for problems, and her tendency to over-react to situations with aggression and anger.

[38]     Mother argues that we should discount the trial court's finding about the driving incident where Child was in the car, but Mother left the door open, because DCS did not substantiate that abuse or neglect occurred. She also asks us to discount her vulgar posting on Facebook regarding the men she had dated "because it is hardly uncommon in today's society to make social media posts when someone is upset[.]" *Appellant's Br.* at 22.

[39]     Here, even though DCS's investigation of the car incident did not substantiate that Mother committed abuse or neglect, the trial court was still entitled to consider the evidence regarding the driving incident. Father was not collaterally estopped from presenting evidence about the driving incident, and the trial court was not collaterally estopped from considering this evidence. *See Infectious Disease of Indianapolis, P.S.C. v. Toney*, 813 N.E.2d 1223, 1228 (Ind. Ct.

App. 2004), *opinion amended on reh'g,* 828 N.E.2d 386 (Ind. Ct. App. 2005). This is so because DCS's decision to not substantiate a finding of abuse or neglect regarding the driving incident was not a final judgment on the merits in a court of competent jurisdiction, and the DCS determination did not share identity of issues with Father's petition to modify custody. *See id.* Thus, the trial court could have reasonably concluded that Mother's actions in the driving incident indicated volatile, impulsive behavior and poor judgment. Moreover, once again, Mother asks us to reweigh the evidence. For instance, the trial court could have reasonably concluded that Mother's derogatory statements about her former boyfriends in her Facebook posting indicated that she was impulsive and showed poor judgment. *Appellant's Conf. App. Vol. 2* at 112. Mother's justification that such postings are "hardly uncommon in today's society," *Appellant's Br.* at 22, is another impermissible request to reweigh the evidence. *See Best*, 941 N.E.2d at 502.

[40] Furthermore, and as she has done with her other arguments, Mother ignores testimony and several trial court findings and conclusions that support the trial court's determination that Mother was impulsive and showed poor judgment. For instance, Mother had, on several occasions, planned to relocate herself and Child in order to be near one or another boyfriend. *Appellant's App. Vol. 2* at 143. Moreover, Mother had spoken to Child about these impending relocations before revealing her intentions to Father or determining how such relocations would affect Child's education and custody or Father's parenting time. *Tr. Vol. V* at 121-23; *Appellant's Conf. App. Vol. 2* at 106. Also, Mother ignores Finding

58, in which the trial court found that the GAL expressed concern that Mother involves Child in "adult conversations," such as encouraging Child to call Father to ask for extra time with Mother rather than Mother contacting Father herself. *Appellant's App. Vol. 2* at 147. Mother also ignores Finding 64, in which the trial court found that Mother exercised poor judgment by not sharing with Father the password to Child's cell phone. *Id*. at 148. Mother also ignores the testimony of the GAL, who characterized Mother as emotional, sometimes volatile, and lacking in insight, seldom recognizing -- unlike Father -- when she has made a mistake and tending to interpret people's actions -- especially Father's — in a distorted manner. *Appellant's Conf. App. Vol. 2* at 106-07. Mother also ignores the trial court findings that Mother's behavior hurt Child's mental health, including finding that Mother's pressure on Child to make Child tailor her statements to Mother in a way that would not offend Mother "has proven to be harmful to [Child's] emotional wellbeing." *Appellant's App. Vol. 2* at 148, 151. Therefore, the trial court did not abuse its discretion in determining that Mother's impulsive, emotionally volatile behavior negatively impacted Child's mental health. *See* Ind. Code § 31-17-2-8(6).

[41] In sum, the trial court did not abuse its discretion in finding that granting Father's petition to modify custody was in Child's best interests based on 1) the worsening of the communication between Mother and Father because of the increasing hostility between them and that this increasing hostility made co-parenting increasingly difficult; 2) Father's excellent track record in supporting Child's schooling compared to Mother's sporadic and subpar record of

participating in Child's education, and 3) Mother's volatile, impulsive, and emotionally unstable behavior and how that behavior was harmful to Child's mental health. Accordingly, we affirm the trial court.

[42] Affirmed.[1]

Bradford, C.J., and May, J., concur.

---

[1] Mother also contends that the GAL was biased against her. In so arguing, Mother uses the wrong legal standard, citing caselaw dealing with judicial bias, not bias by a witness. *See Appellant's Br.* at 25. Thus, she has waived this issue for failure to make cogent argument. *See Jarman v. State*, 114 N.E.3d 911, 915 n.2 (Ind. Ct. App. 2018), *trans. denied*. Moreover, Mother's argument is yet another impermissible request to reweigh the evidence. *See Best*, 941 N.E.2d at 502. We reject Mother's argument that the GAL was biased against her.